[Cite as *Bennett v. Bennett*, 2012-Ohio-5788.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

GEORGE F. BENNETT                              :

    Plaintiff-Appellant/                  :  C.A. CASE NO.   2012 CA 36
    Cross-Appellee

                                             :  T.C. NO.   09DR1176

v.

                                             :  (Civil appeal from Common

JILL M. BENNETT                                    Pleas Court, Domestic Relations)

    Defendant-Appellee/                   :
    Cross-Appellant

                                             :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the     7th     day of     December    , 2012.

. . . . . . . . . .

DOUGLAS W. GEYER, Atty. Reg. No. 0022738 and SAMANTHA L. BERKHOFER, Atty. Reg. No. 0087370, 451 Upper Valley Pike, Springfield, Ohio 45504
        Attorneys for Plaintiff-Appellant/Cross-Appellee

JON PAUL RION, Atty. Reg. No. 0067020 and NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 130 W. Second Street, Suite 2150, P. O. Box 1262, Dayton, Ohio 45402
        Attorneys for Defendant-Appellee/Cross-Appellant

. . . . . . . . . .

FROELICH, J.

       **{¶ 1}**   George F. Bennett appeals from a judgment entry and decree of

divorce of the Clark County Court of Common Pleas, Domestic Relations Division, which awarded custody of the Bennett children to Jill Bennett, determined that there was no separate property traceable to personal injury settlements several years earlier, and divided the parties' assets equally, with the exception of a son's medical bill, which Mrs. Bennett was ordered to pay.   Mrs. Bennett cross-appeals.

{¶ 2}   On appeal, Mr. Bennett challenges the trial court's decision to reject his shared parenting plans in favor of awarding custody to Mrs. Bennett.   He also objects to the trial court's decision to equally divide funds in a particular account, some of which he claims originated from a personal injury claim, rather than treating those funds as his separate property.   Mrs. Bennett claims that the trial court abused its discretion in concluding that a medical debt related to their son's treatment for a dog bite was "non-marital" and in ordering her to pay the debt in its entirety.   For the reasons that follow, the judgment of the trial court will be affirmed in part, reversed in part, and remanded.

I

{¶ 3}   The Bennetts were married in 1999 and filed for divorce in 2011.   Two children were born of the marriage, who were ages 10 and 8 at the time of the divorce.   In 2003, Mr. Bennett was injured in a car accident during the course of his employment with the Clark County Sheriff's Department.   As a result of the accident, he sustained back injuries and a brain aneurism.   The parties received payments from several sources in connection with Mr. Bennett's injuries.   While the parties were separated, one of their sons was bitten by Mrs. Bennett's dog, requiring surgery and incurring medical bills.

{¶ 4}   After the parties filed for divorce, the disputed matters were heard by a

magistrate. The magistrate issued a 51-page decision, which recounted the evidence presented and provided detailed explanations for most of the magistrate's findings and legal conclusions. Both parties filed objections to the magistrate's decision. The trial court overruled all of the objections and adopted the magistrate's order. Because the trial court adopted the magistrate's conclusions with a less detailed discussion of the evidence than that contained in the magistrate's decision, we will refer to and rely on many of the magistrate's findings – which the trial court approved – in reviewing the trial court's judgment.

{¶ 5} Mr. Bennett appeals, raising two assignments of error, and Mrs. Bennett raises one assignment of error on cross-appeal.

II

{¶ 6} In his first assignment of error, Mr. Bennett contends that the trial court's decision to designate Mrs. Bennett as the residential parent for the parties' two minor children, rather than to adopt one of the shared parenting plans he proposed, was against the manifest weight of the evidence and was not in the best interest of the children.

{¶ 7} Pursuant to R.C. 3109.04, the factors that a court is to consider in allocating parental rights and responsibilities include: (a) the wishes of the parents; (b) if interviewed, the child's wishes and concerns; (c) the child's interaction and interrelationship with parents, siblings, and other significant people; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all persons involved; (f) which parent is more likely to abide by court orders regarding parenting time rights; and (g) whether under a shared-parenting plan one parent has interfered with the other's parenting rights.

{¶ 8} A reviewing court may not reverse a custody determination unless the trial

court has abused its discretion. *Pater v. Pater*, 63 Ohio St.3d 393, 588 N.E.2d 794 (1992). The approval or rejection of a shared parenting plan lies within the court's discretion. R.C. 3109.04(D)(1)(b). An abuse of discretion implies an attitude of the trial court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218, 450 N.E.2d 1140 (1983).

{¶ 9} We defer to the trial court on findings of fact because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 20, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶ 10} At the hearing, it was undisputed that there were hard feelings between the parties because Mr. Bennett had an affair, which, at least in part, eventually led to the end of their marriage. It was also undisputed that Mrs. Bennett had been the primary caregiver and that Mr. Bennett was a good father to the children. However, Mrs. Bennett described her relationship with Mr. Bennett during the separation as "a roller coaster," stating that sometimes Mr. Bennett was nice and sometimes he was manipulative. She testified that their communication was not good and that they had difficulty reaching agreement on issues related to the boys.

{¶ 11} Mrs. Bennett also described incidents where Mr. Bennett intentionally made physical contact with her, threw her phone against a wall and broke it, and hid her car keys. She recounted instances in which he had locked himself in a room with the children at their home to "hav[e] his time" with them and had not allowed her to have contact with

the boys while they were with him for a visit. She stated that there was no trust between them because of his affair and other lies she had discovered after the affair. She also testified that, as a teacher, she had seen kids from shared parenting homes who were "a royal mess," forgetting clothes and homework, etc., as they went back and forth from house to house. Because of her communication problems with Mr. Bennett and her other experiences with shared parenting, she did not think such an arrangement was in the boys' best interest.

{¶ 12} Mr. Bennett presented the testimony of several friends and relatives who stated that he was a good father, that he put his children first among his priorities, and that, in their opinions, a shared parenting plan or Mr. Bennett's extensive involvement with the children after the divorce was in the children's best interest.

{¶ 13} A psychologist who evaluated the parents and the guardian ad litem each recommended to the court that a sole-custody arrangement would serve the best interest of the children and that Mrs. Bennett be designated the custodial and residential parent.

{¶ 14} In a very thorough decision, the magistrate discussed the factors set forth at R.C. 3109.04 for determining the best interests of children in making a custody determination. The evidence showed that both parties were capable parents. But the magistrate noted that they had complained of and provided examples of communication and cooperation failures, and he noted that there was "little substantive communication between [Mrs. Bennett] and [Mr. Bennett] about important matters concerning the raising of their children. Overall, it is fair to say that [the parties] do not trust each other and cannot now work with each other for the benefit of their children." The magistrate concluded that the

parents could not jointly share in the decision-making process regarding the best interests of the children and that they had demonstrated little ability or desire to encourage a loving relationship with the other parent. Thus, the magistrate found that shared parenting was not in the best interest of the children, and the trial court agreed with this conclusion.

{¶ 15} Mr. Bennett contends on appeal, as he did in the trial court, that the trial court should have recognized Mrs. Bennett's "proven anger, resentment, and desire to find revenge" for his affair as a motivation in her opposition to shared parenting. He does not deny that friction exists between them. But he expresses confidence that cooperation will "usually quickly redevelop[ ] between two formerly rational and nurturing parents," that the strain between Mrs. Bennett and him will abate over time, and that shared parenting is in the boys' best interest.

{¶ 16} Although there was evidence to support Mr. Bennett's assertion that both parents have a "loving, caring, and nurturing relationship" with the children, the decision to award shared custody focuses as much on the parents' ability and willingness to work with one another as on their relationships with the children. Based on the evidence presented in this case, the trial court did not abuse its discretion in concluding that shared parenting was not a viable option.

{¶ 17} The first assignment of error is overruled.

III

{¶ 18} In his second assignment of error, Mr. Bennett contends that the trial court erred in concluding that funds in a particular joint account were not traceable to the payments from his personal injury claims related to the 2003 accident, in concluding that the

funds in the account were marital assets, and in dividing those assets in the divorce.

{¶ 19} Upon the application of either party in an action for divorce, the trial court must determine what constitutes marital property and what constitutes separate property, divide the marital property equitably between the parties, and "disburse a spouse's separate property to that spouse." R.C. 3105.171(D). The definition of separate property includes "all real and personal property and any interest in real or personal property that is found by the court to be * * * [c]ompensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets." R.C. 3105.171(A)(6)(a)(vi). However, if any portion of a personal injury award or settlement is attributable to the "uninjured" spouse's loss of consortium claim, then that portion of the award is the separate property of the "uninjured" spouse. *Mayer v. Mayer*, 5th Dist. Stark No. 2010-CA-277, 2011-Ohio-1884, ¶ 8, citing *Lust v. Lust*, 3d Dist. Wyandot No. 16-02-07, 2002-Ohio-3629.

{¶ 20} Where an award is linked to a personal injury, "[t]he starting point is to presume the benefits are separate [property] pursuant to [R.C. 3105.171(A)], and then it is the burden of the party seeking to establish the property is marital to rebut the statutory presumption." *Mayer* at ¶ 10.

{¶ 21} The factual findings of a trial court relating to its classification of property as marital or separate are reviewed to determine whether they are against the manifest weight of the evidence, and will not be reversed if they are supported by some competent and credible evidence. *Kovacs v. Kovacs*, 6th Dist. Sandusky No. S-09-039, 2011-Ohio-154, ¶ 13.

*The Disputed Property*

**{¶ 22}** During the Bennetts' marriage, they each maintained a separate checking account into which their respective paychecks were deposited, although both spouses were named on the accounts for estate planning purposes. The parties also had an account which they treated as a "joint" account, and their sons had accounts into which the parties occasionally transferred funds.

**{¶ 23}** The evidence offered at the hearing established that the Bennetts received the following amounts related to Mr. Bennett's accident: $29,000 from the insurer of the driver who was at fault (USAA), $112,000 from Clark County's insurance pool (CORSA), and $12,880 from the Ohio Bureau of Workers' Compensation. These payments resulted from negotiations in which the Bennetts were represented by counsel, but not from litigation, and represent the amount received by the Bennetts after the payment of attorney fees. It does not appear that any complaint was ever filed. The exact nature of the Bennetts' claims and of the payments they received, i.e., the amount or proportion attributable to loss of consortium, lost wages, medical bills, etc., was not specified in the settlement documents provided in the current action.

**{¶ 24}** In 2004, both parties signed the settlement agreement with USAA; the check for $29,000, which came through the Bennetts' attorney's office, was made out to and endorsed only by Mr. Bennett. No evidence was presented as to where that check was deposited but, at around that time, $24,000 was deposited into Mr. Bennett's checking account. Mr. Bennett testified that an additional $4,000 was split between the sons' accounts at that time.

{¶ 25} The Bennetts received the payment of $112,000 from the CORSA settlement in 2005. The funds from CORSA, which also came through the attorney's office, were distributed in a check made out only to Mr. Bennett. No evidence was presented as to where this check was initially deposited, but Mr. Bennett testified that $94,000 was transferred into the account of one of his sons, temporarily, while Mr. Bennett decided where to deposit it more permanently. Later, $80,000 was transferred from the son's account to the parties' joint account.

{¶ 26} In 2007, Mr. Bennett received $12,880 from the Bureau of Workers' Compensation. These funds were deposited into the joint account.

{¶ 27} Over the years, money from the joint account was used to make several large purchases, often in combination with marital funds. These purchases included a hot tub, a camper, an all-terrain vehicle, a car for Mrs. Bennett, and a down payment and some improvements on an investment property. Some documentation was presented as to the purchases in question, but the exact sources of the monies used and their amounts was not clear with respect to all the purchases.

{¶ 28} In Mr. Bennett's testimony, he admitted that, in addition to the settlement monies, other deposits had been made into the joint account at various times; he could not state with certainty what the sources of those funds had been. He allowed for the possibility that some of those funds had come from Mrs. Bennett's income. A number of smaller withdrawals were also made for which Mr. Bennett could provide no explanation.

{¶ 29} Mrs. Bennett testified that some of the money that was paid in the settlements was in compensation for her loss of consortium as a result of the accident, as

well as Mr. Bennett's injuries, pain, and suffering. In support of this argument, she produced a letter that she had written to USAA during the negotiations, which recounted how the accident had affected their family life. Mr. Bennett claimed that all of the payments, including workers' compensation, were attributable to his injuries, pain, and suffering. He denied that the funds were compensation for lost wages and, in fact, he denied that he had lost any wages.

{¶ 30}   Mrs. Bennett described the joint account into which some of the settlement funds had been deposited as a savings account; she stated that the couple had agreed to try to maintain about $90,000 in the account, and that when the account balance dropped below this amount because of purchases, they built the balance back up by depositing investment income and income tax refunds. Mrs. Bennett claimed that all of the money remaining in the joint account at the end of the marriage was marital property; Mr. Bennett admitted that the funds had been kept in a joint account, but he claimed that the funds were traceable to his personal injury settlement and thus that the entire amount was his separate property.

{¶ 31}   Approximately $90,000 remained in the joint account near the time of the parties' separation. Mrs. Bennett withdrew $45,090 in April 2008; the next day, Mr. Bennett withdraw the remaining balance of $44,732. Mrs. Bennett testified that she withdrew half of the money and placed it in a certificate of deposit only in her name because she was fearful that Mr. Bennett was preparing to leave her, and she wanted to provide for her financial security in the event that he did.

{¶ 32}   Amounts that had previously been spent on joint purchases or had been deposited into other accounts were not in dispute at the time of the divorce; those funds, or

the purchases made with those funds, were treated as marital assets.

*The Burden of Proof*

**{¶ 33}** In its judgment, the trial court correctly observed that any payment to a spouse for personal injury that was traceable to "pain, suffering, and disfigurement" was the separate property of that spouse, but that any portion attributable to "lost wages, lost earning capacity, and medical and hospital expenses" paid during the marriage was marital property subject to division in a divorce. The trial court stated, however, that Mr. Bennett had the burden of proof by a preponderance of the evidence, because "[m]oney acquired during the marriage is presumed to be marital unless proven to be separate property," and Mr. Bennett was the party seeking to have the property declared separate property.

**{¶ 34}** We disagree with the trial court's statement that all money acquired during marriage is presumed to be marital property, regardless of the source, thereby placing the burden of proof on the party asserting a right to separate property. R.C. 3105.171 clearly states that assets traceable to personal injury awards, inheritances, and other enumerated sources are separate property. The fact that such assets are acquired during a marriage does not automatically negate the character of those assets. However, it is correct that where separate and marital assets have been commingled, the party asserting the existence of separate property has the burden to establish, by the preponderance of the evidence, the traceability of the assets to separate property. *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 23 (2d Dist.), citing *Peck v. Peck*, 96 Ohio App.3d 731, 645 N.E.2d 1300 (12th Dist.1994); *Fisher v. Fisher*, 2d Dist. Montgomery No. 20398, 2004-Ohio-7255, ¶ 16.

*The Trial Court's Determination Regarding the Nature of the Property*

{¶ 35}    The trial court made several findings with respect to Mr. Bennett's assertion that all of the settlement monies were his separate property and that the funds in the parties' joint account were traceable to those settlements.   The trial court concluded that Mr. Bennett's workers' compensation award might have been for permanent partial disability, which compensates for "permanent residual problems stemming from the injury," or temporary total disability, which replaces lost wages while an injured worker is unable to work.   The trial court found that "[t]here is no evidence that the Bureau [of Workers' Compensation] pays for pain and suffering" and that there is no "loss of consortium" claim available to a spouse through Workers' Compensation.   Because no evidence was offered at the hearing, other than Mr. Bennett's testimony, as to how his workers' compensation award was determined or how it was "apportioned [between] his personal injury, future earnings or economic losses," the trial court determined that this portion of the settlement was "all commingled from the start" and could not be traced to separate property.   The trial court treated it as marital property.

{¶ 36}    The trial court concluded that the Bennetts' claims against USAA and CORSA encompassed claims for both Mr. Bennett's injuries and Mrs. Bennett's loss of consortium.   The settlements, however, did not apportion the damages between these two types of claims.   The court found that the inability to determine how the settlements were apportioned between the parties' claims was "fatal to proving any claim of separate property."   Further, the court determined that "there was a lot of commingling" of the settlement monies with marital monies from 2005 until the parties' separation, "which

further made the tracing of the settlement monies with any confidence impossible."

{¶ 37} Based on the foregoing conclusions, the trial court found that there was no separate property and ordered that the marital property, including the approximately $90,000 balance in the joint account near the time of their separation, be divided equally. This division was accomplished through the division of the parties' assets and a short-term plan by which Mr. Bennett would make monthly payments to Mrs. Bennett.

{¶ 38} Although the evidence supported Mr. Bennett's assertion that he had received a personal injury award that, were it traceable, would have constituted his separate property, the evidence also supported the trial court's inference that Mrs. Bennett had received funds in payment of her loss of consortium claim, which would have constituted her separate funds, if traceable. Because the apportionment of the USAA and CORSA awards between payments for Mr. Bennett's pain and suffering, lost wages (if any), and Mrs. Bennett's loss of consortium was never delineated, and because the parties had commingled their separate property with marital assets for many years following the awards, the trial court reasonably concluded that the assets could not be traced. Under these circumstances, an equal division of the account into which separate and marital funds had been deposited was equitable.

{¶ 39} The second assignment of error is overruled.

IV

{¶ 40} In her cross-assignment of error, Mrs. Bennett argues that the trial court improperly ordered her to pay the entire debt on medical bills related to an injury to one of the children, based on the court's conclusion that her poor judgment had caused or

contributed to the injury.

{¶ 41} The evidence established that Mrs. Bennett acquired a Great Dane, which she named Thor, during the parties' separation. Mr. Bennett also owned a Great Dane. After observing the dogs together, Mr. Bennett expressed concern to Mrs. Bennett about Thor's aggressiveness, although he admitted that some aggressiveness among dogs was "not uncommon" and that it abated after the dogs had been together for a little while. Mr. Bennett testified, without objection, that he had heard about several other incidents involving Thor that caused him concern, including an incident in which Thor cornered a neighbor inside Mrs. Bennett's house. Mr. Bennett discussed these concerns with Mrs. Bennett, and she agreed to get rid of the dog. Although Mrs. Bennett found a new placement for Thor, she failed to follow through. A short time later, the dog bit one of the Bennetts' sons on the face.

{¶ 42} Because the son had lacerations on his face, the Bennetts met at the hospital and agreed to use a plastic surgeon for his treatment, even if the surgeon were not in the parties' insurance network. The Bennetts did not discuss before the surgery who would be responsible for paying any associated out-of-pocket expenses. Those expenses totaled over $7,800.

{¶ 43} In its decision, the trial court stated that the "acquisition of this dog and the failure to segregate it from the children after it became aggressive was an example of poor judgment" by Mrs. Bennett. The court found the debt related to the surgery to be "the separate non-marital debt of [Mrs. Bennett] because it was [her] unilateral decision to obtain the dog" and her "error in judgment" that led to the injury.

**{¶ 44}** A marital debt is any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose. *Lucas v. Lucas,* 7th Dist. Noble No. 11NO382, 2011-Ohio-6411, ¶ 33, citing *Ketchum v. Ketchum*, 7th Dist. Columbiana No. 2001 CO60, 2003-Ohio-2559, ¶ 47. Debts incurred during the marriage are presumed to be marital unless it can be proved that they are not. *Id.,* citing *Vergitz v. Vergitz,* 7th Dist. Jefferson No. 05JE52, 2007-Ohio-1395, ¶ 12; *Kehoe v. Kehoe*, 8th Dist. Cuyahoga No. 97357, 2012-Ohio-3357, ¶ 14. The party seeking to establish a debt is separate rather than marital bears the burden of proof in the trial court. *Lucas* at ¶ 33; *Hurte v. Hurte,* 164 Ohio App.3d 446, 2005–Ohio–5967, 842 N.E.2d 1058, ¶ 21 (4th Dist.). As discussed above, the classification of property is reviewed to determine whether it is against the manifest weight of the evidence and will not be reversed if supported by some competent and credible evidence. Kovacs, 6th Dist. Sandusky No. S-09-039, 2011-Ohio-154, ¶ 13.

**{¶ 45}** Although, especially in hindsight, Mrs. Bennett might have acted with more caution or more decisively in removing Thor from her home, the trial court's conclusion that the debt incurred in treating the son's injury was "non-marital" is unsubstantiated by the record. Because the debt was incurred during the marriage, it was presumed to be marital debt. Moreover, the medical treatment of their child was for their joint benefit and was for a valid marital purpose.

**{¶ 46}** Mr. Bennett's assertion, based on his observations under unexplained circumstances, that Thor had been "aggressive" with another dog was of questionable value in predicting the dog's future behavior toward children; Mr. Bennett admitted that aggressive behavior was "not uncommon" between dogs and that the dogs settled down after some time

together. Mr. Bennett's claims that Thor had acted aggressively toward other people were non-specific as to time, place, and circumstances and were based on hearsay. Although the magistrate's decision stated that the dog was a pit bull, the testimony at the hearing established that Thor was a Great Dane and that Mr. Bennett owned a dog of the same breed. Further, the circumstances surrounding the incident during which the Bennetts' son was bitten were not developed at the hearing.

{¶ 47} The trial court's treatment of the debt implied that Mrs. Bennett should have anticipated and prevented their son's injury and that her actions removed the costs associated with the son's treatment from being a marital debt. This conclusion is not supported by competent and credible evidence. The debt for the son's medical treatment was a marital debt because it was "incurred during the marriage for the joint benefit of the parties or for a valid marital purpose." Lucas, 7th Dist. Noble No. 11NO382, 2011-Ohio-6411, ¶ 33, citing Ketchum, 7th Dist. Columbiana No. 2001 CO60, 2003-Ohio-2559. Moreover, Mr. Bennett fully participated in the decision to use a non-network plastic surgeon, a decision which benefitted the child, not Mrs. Bennett. The alleged used of "poor judgment" by a spouse is not a basis for concluding that debts incurred during the marriage are nonmarital debts. The trial court should have divided the debt equitably, as it did the parties' other assets and debts.

{¶ 48} The cross-assignment of error is sustained.

V

{¶ 49} The judgment of the trial court will be affirmed in part and reversed in part. The matter will be remanded for the trial court to address the equitable division of the medical debt.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Douglas W. Geyer
Samantha L. Berkhofer
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Thomas J. Capper