[Cite as *Sivertsen-Kuhn v. Kuhn*, 2019-Ohio-3525.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| SHERYL M. SIVERTSEN-KUHN | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-17 |
| | : | |
| v. | : | Trial Court Case No. 2015-DR-215 |
| | : | |
| KEITH A. KUHN | : | (Domestic Relations Appeal) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of August, 2019.

. . . . . . . . . . .

JAMES R. KIRKLAND, Atty. Reg. No. 0009731, 10532 Success Lane, Dayton, Ohio 45409
    Attorney for Plaintiff-Appellee

KEITH A. KUHN, 7170 Ashview Lane, Liberty Township, Ohio 45011
    Defendant-Appellant, Pro Se

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, Defendant-Appellant, Keith Kuhn, appeals pro se from a judgment and decree of divorce entered in an action brought by Plaintiff-Appellee, Sheryl Sivertsen-Kuhn.[1] Keith has not presented assignments of error, but from the "issues presented," Keith appears to contend that the trial court erred in the following respects: (1) by awarding custody of the parties' minor child to Sheryl, rather than granting shared parenting; (2) by awarding Sheryl reimbursement for medical bills; and (3) by awarding Sheryl reimbursement for attorney fees in lieu of spousal support.

{¶ 2} For the reasons discussed below, the alleged errors have no merit. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} This case began as a complaint for legal separation, which Sheryl filed in August 2015. The parties were married in 1994, and at the time of the separation, had two minor children, a daughter and a son. In September 2015, Keith filed an answer to the complaint and a counterclaim for divorce. In October 2015, the trial court filed a temporary order making Sheryl the residential parent and granting Keith parenting time per the court's standard order. Keith was also ordered to pay temporary child support of $1,495.21 per month, plus processing. In addition, spousal support was to be decided at a later hearing. Ultimately, in August 2016, the court granted Sheryl's motion to convert the legal separation action into a divorce action.

{¶ 4} Despite the relative lack of property to be divided (the parties had no marital

---

[1] For our convenience, we will refer to the parties by their first names.

real estate and fairly insubstantial savings and retirement accounts), the final divorce decree was not filed until March 22, 2019. The delay was caused by squabbling over parenting time and medical bills, contempt motions filed by Keith, and the fact that Keith changed counsel several times and ultimately chose to represent himself.

{¶ 5} After completing the hearings on the case, the court filed a final decree of divorce designating Sheryl as the residential parent and legal custodian of the parties' son. Their daughter had been emancipated on August 31, 2018. Keith was designated as a non-residential parent and was given parenting time in accordance with the court's standard order during the school year. The court further concluded that awarding attorney fees to Sheryl of $25,000 in lieu of spousal support would be fair and equitable. In addition, the court awarded Sheryl one-half of the $23,308.87 in medical expenses she had paid for herself and the minor children from the date of the parties' separation to the last day of trial on June 18, 2018, and one-half of the outstanding medical expenses of $1,871.38. The court held that the medical bills were marital in nature and that the parties should share the expenses equally. Keith timely appealed, pro se, from the judgment of the trial court.

## II. Custody Award

{¶ 6} As we interpret the First Assignment of Error, Keith contends that:

The Trial Court Erred in Awarding Custody to Appellee, Rather than Granting Shared Parenting.

{¶ 7} Under this assignment of error, Keith claims that the trial court erred in awarding custody of their minor son, to Sheryl because of concerns the guardian ad litem

("GAL") raised in his report about Sheryl's mental stability and behavior. Keith also contends that Sheryl engaged in property destruction and theft, and he focuses on alleged statements of a magistrate that shared parenting would be expected. Further, Keith maintains that he and Sheryl had actively engaged in shared parenting while the case was pending and were able to negotiate a satisfactory resolution of a contempt motion.

{¶ 8} After reviewing the entire record, including the transcripts of all hearings, our first observation is that the magistrate did not say that shared parenting would be expected. The magistrate simply discussed the pending issues, which included multiple contempt motions that Keith had filed, as well Keith's motion for a reduction in temporary child support. *See* February 13, 2019 Hearing Transcript, p. 4. These matters were resolved by the parties' agreement. *Id.* at p. 5.

{¶ 9} R.C. 3109.04(A) requires trial courts to "allocate the parental rights and responsibilities for the care of the minor children of the marriage." The court has two choices in this regard – either ordering shared parenting or giving residential and legal custody to one parent. If neither parent files a shared parenting plan, or if (as here), at least one parent has filed both a pleading or motion and a shared parenting plan under R.C. 3109.04(G), but the plan is not in the children's best interest, the court may designate one parent as residential and legal custodian and allocate the primary care to that parent. R.C. 3109.04(A)(1).

{¶ 10} Alternatively, if at least one parent files a pleading or motion and a shared parenting plan, and if the plan is in the children's best interest and the court approves the plan in accordance with R.C. 3109.04(D)(1), the court may then allocate parental care of the children to both parents and issue a shared parenting order that requires the parents

to share all or some of the children's legal and physical care.   R.C. 3109.04(A)(2).

{¶ 11} R.C. 3109.04(D)(1)(a) provides that "[u]pon the filing of a pleading or motion by either parent or both parents, in accordance with division (G) of this section, requesting shared parenting and the filing of a shared parenting plan in accordance with that division, the court shall comply with division (D)(1)(a)(i), (ii), or (iii) of this section, whichever is applicable."   In the case before us, Keith included a request for shared parenting in his counterclaim for divorce.   *See* Doc. #64, filed on January 6, 2017.[2]   Keith also filed a motion for shared parenting and a proposed shared parenting plan on January 11, 2017. *See* Doc. #66.   Sheryl did not ask for shared parenting in her divorce complaint, nor did she ever file a shared parenting plan.   In such situations, R.C. 3109.04(D)(1)(a)(iii) applies.

{¶ 12} Keith's plan for shared parenting, however, was not timely filed.   According to R.C. 3109.04(G), "[t]he plan for shared parenting shall be filed with the petition for dissolution of marriage, if the question of parental rights and responsibilities for the care of the children arises out of an action for dissolution of marriage, or, in other cases, at a time at least thirty days prior to the hearing on the issue of the parental rights and responsibilities for the care of the children."   As noted, Keith's petition was filed on January 11, just two days before the January 13, 2017 final divorce hearing, and, therefore, was untimely.   We have held that this requirement is "directory, not mandatory," and that a trial court has "discretion to relieve a party of the statutory deadline and grant" the request to untimely file a shared parenting plan.   *Harris v. Harris*, 105 Ohio

---

[2] As noted, the legal separation was converted to a divorce action in August 2016.   In December 2016, the trial court gave Keith permission to file an untimely answer and counterclaim.   *See* Doc. #62.

App.3d 671, 674, 664 N.E.2d 1304 (2d Dist.1995).

{¶ 13} However, in the case before us, the trial court never stated whether it intended to relieve Keith of the statutory deadline. In the absence of a ruling by the trial court, we presume that the court denied the untimely motion for shared parenting. *E.g., Schaeffer v. Nationwide Mut. Ins.*, 2d Dist. Greene No. 2001 CA 131, 2002-Ohio-4811, ¶ 32 (when trial courts fail to rule on a motion, appellate courts presume the motion was denied). We also note that Keith did not ask for shared parenting at the divorce hearing; instead, he asked for sole residential and legal custody. *See* January 13, 2017 Hearing Transcript, pp. 77-78.

{¶ 14} In the case before us, the divorce decree made the following statement about the allocation of parental rights and responsibilities:

> Based upon the testimony, evidence, and record in the case, the Court finds it appropriate to follow the recommendations of the Guardian ad Litem (hereinafter GAL). The Court hereby Orders that Plaintiff shall be designated the residential parent and legal custodian of the parties' minor child[.] * * * Defendant is the non-residential parent.

Doc. # 221, Final Judgment and Decree of Divorce, p. 3. After making this statement, the trial court made provisions for Keith's parenting time and ordered that Keith would be responsible for transporting the child to and from Sheryl's residence.

{¶ 15} By agreeing with the GAL's recommendations, the trial court concluded that making Sheryl the residential parent and legal custodian was in the son's best interest. Under R.C. 3109.04(F)(1), trial courts are required to consider a set of factors in deciding a child's best interest, including the parents' wishes; the child's wishes, if the court has

interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interest; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. *In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9.

{¶ 16} We have previously held that, while R.C. 3109.04(F)(1) instructs courts to "consider" the enumerated factors, "an alleged failure to give the required consideration will not be found * * * against the manifest weight of the evidence so long as the court's judgment is supported by some competent, credible evidence." *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 32, citing *Bunten v. Bunten*, 126 Ohio App.3d 443, 710 N.E.2d 757 (3d Dist.1998). This is based on the fact that if a party does not request findings of fact and conclusions of law under Civ. R. 52, "the court's judgment concerning allocation of parental rights and responsibilities 'may be general for the prevailing party.' " *Id.*, quoting Civ. R. 52. *See also Bunten* at 447, citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 488 N.E.2d 857 (1986) (the trial court does not need "to set forth its analysis as to each factor in its judgment entry, so long as the judgment entry is supported by some competent, credible evidence.").

{¶ 17} We have also said, concerning the initial allocation of custody under R.C. 3109.04(F)(1), that "while helpful to a reviewing court, there is no requirement that a trial court expressly and separately address each best-interest factor. * * * Absent evidence to the contrary, an appellate court presumes that the trial court considered the relevant statutory factors." *Wise v. Wise*, 2d Dist. Montgomery No. 23424, 2010-Ohio-1116, ¶ 5, citing *Quint v. Lomakoski*, 167 Ohio App.3d 124, 2006-Ohio-3041, 854 N.E.2d 225, ¶ 12 (2d Dist.), and *In re Henthorn*, 7th Dist. Belmont No. 00-BA-37, 2001-Ohio-3459, *3 (Nov.

28, 2001).

{¶ 18} Here, there is no evidence that the trial court failed to consider the statutory factors. In particular, the court relied on the findings of the GAL, who stated in his report that he had reviewed all the statutory factors in R.C. 3109.04(F)(1) in connection with the facts described in the report. *See* Plaintiff's Ex. X, p.1. The GAL included a comprehensive analysis of these factors in the report, and also testified at trial.

{¶ 19} After reviewing the record, including the transcripts and the GAL's report, we conclude that competent, credible evidence supported the trial court's decision to award custody to Sheryl. According to the testimony, Sheryl had been a stay-at-home mother and primary caretaker of the parties' children during the marriage. In contrast, Keith had been involved in his career, at times moving on to the next job while Sheryl and the children were left behind, with Sheryl alone providing care of the children until school was out or the move could be completed. At times, this involved a period of months.

{¶ 20} In his report, which was filed in late March 2016, the GAL discussed all the statutory factors and then concluded that Sheryl should be named residential and custodial parent, with Keith receiving standard parenting time. The GAL noted that both parties had appropriate homes, although Keith's home was more crowded, with his live-in companion and her three children. At that home, the parties' son had to share a bedroom with two other boys.

{¶ 21} The GAL also commented that some friction may have been caused by Keith's attention to his companion and her children, such that Keith spent little time alone with his own children. According to the GAL, Keith failed to consider what his actions did to his children (referring to moving in with a girlfriend and failing to spend quality time

with the children).   In addition, the GAL expressed concern that Sheryl had shared too much information with the children and was concerned that she might talk negatively about Keith's girlfriend and her children.

{¶ 22} Prior to the January 2017 divorce hearing, the GAL conducted further investigation.   The GAL was aware of a criminal action that Sheryl had been involved in, and said that while he would prefer parents not have criminal problems, the case did not bear on safety or anything else involving the children.   Furthermore, the GAL stressed that the minor son was very close to his siblings, who lived with Sheryl, and that the elder siblings were somewhat estranged from Keith.   The GAL also noted that Keith's girlfriend was more involved in parenting time than Keith, and stressed that he (the GAL) was not sure how much Keith really wanted custody.

{¶ 23} The GAL was aware of concerns expressed about Sheryl's mental health, based on her oversharing and tracking of Keith with a GPS.   However, the marriage was a lengthy one, and Sheryl took the divorce very hard.    With respect to the GPS, the GAL stated that poor behavior in divorce cases is not uncommon.   Thus, while the GPS tracking was more extreme than usual conduct, Sheryl told the GAL that her husband had moved out, that she did not know where he lived, that he was cohabitating with another woman who had children, and that she did not know what was going on.   In addition, the children said the same thing to the GAL, i.e., that they were caught off guard that their father had moved out and no one knew where he was.

{¶ 24} Notably, the GAL stressed that the majority of things that happened were in the summer of 2015 and maybe into early 2016.   He also said that nothing he heard during the hearing had changed his opinion that Sheryl should be the residential parent

and legal custodian.   As a final matter, after reviewing the record, we see little indication that the parties can successfully cooperate in raising their child.   The sole instance of "cooperation" occurred after almost four years, with most of the lengthy delay devoted to trivial matters that should have been easily resolved if the parties could have cooperated.

{¶ 25} In view of the above facts, the trial court's custody decision was supported by competent credible evidence.   Accordingly, the First Assignment of Error is overruled.


### III.   Medical Bills

{¶ 26} Keith's Second Assignment of Error, as we interpret it, is that:

The Trial Court Erred by Awarding Appellee Reimbursement for Medical Bills.

{¶ 27} Under this assignment of error, Keith argues that the trial court erred in ordering him to pay medical bills because he was unemployed at the time of the divorce, and Sheryl was capable of supporting herself.   Keith further contends that the court failed in these ways: (1) to consider his spreadsheet (Defendant's Ex. BBB); (2) to find that some listed expenses were duplicates; and (3) to find that Keith should not be responsible for bills that were not submitted to insurance.

{¶ 28} "The statute governing marital property division requires a trial court to divide marital property equitably between the parties."   *Ulliman v. Ulliman*, 2d Dist. Montgomery No. 22560, 2008-Ohio-3876, ¶ 28, citing R.C. 3105.171(B).   "Like assets, debts too are considered part of the marital property that must be divided. * * * The division decision begins with an equal division, but the court may divide the property unequally if it believes that equality would be inequitable."   *Id.*, citing R.C. 3105.171(C)(1).   "A

marital debt is any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose. * * * Debts incurred during the marriage are presumed to be marital unless it can be proved that they are not." *Bennett v. Bennett*, 2d Dist. Clark No. 2012 CA 36, 2012-Ohio-5788, ¶ 44. The party seeking to prove a debt is separate instead of marital has the burden of proof. *Id.*

{¶ 29} Trial courts have broad discretion over the division of marital property. *Dickinson v. Dickinson*, 2d Dist. Champaign No. 2012-CA-5, 2012-Ohio-4856, ¶ 20. We, therefore, review a court's decision for abuse of discretion, which " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). A decision is unreasonable if no sound reasoning supports the decision. *Id.*

{¶ 30} The issue of medical expenses was considered extensively by the trial court, which held hearings on two separate days (September 20 and December 21, 2017). In its decision, the court found that it could verify $23,308.87 in medical bills that Sheryl had paid, and $1,871.38 in outstanding bills. These bills were incurred on behalf of Sheryl, the son and the daughter (prior to the date of her emancipation on August 31, 2018). The court found it equitable to impose one-half of the expenses on Keith and ordered him to pay $11,654.44 within six months of the filing of the divorce decree and to pay his half of the unpaid medical bills ($935.69) directly to Sheryl within 60 days of the

filing of the decree.

**{¶ 31}** The trial court's decision was consistent with R.C. 3105.171(C)(1), which envisions an equal division of property and debts, unless it would be inequitable. Keith contends that the decision was inequitable because Sheryl's listed income ($150,000) was significantly greater than his income ($23,088). Keith also estimates that Sheryl's income is over $200,000 per year, based on an escalating lease and its non-taxable nature. Thus, according to Keith, the trial court erred in only using $150,000 when calculating child support (and in considering the disparity of incomes).[3]

**{¶ 32}** Keith's child support was substantially reduced to around $186 per month, due to his temporary unemployment. The record indicates that Keith had two master's degrees – an MBA and an MSW – and was a well-experienced chief executive officer of hospitals.

**{¶ 33}** Keith initially came to the Dayton, Ohio, area in November 2013 as a chief executive officer ("CEO") for Haven Behavioral Healthcare. After resigning and being out of work for a short time, Keith took a position as CEO for a company called Diamond and started in December 2015, at a base salary of $148,000. He then voluntarily left Diamond in October 2016 and took a position as CEO at Assurance Health System, a psychiatric hospital in Blue Ash, Ohio. At trial in January 13, 2017, Keith reported that his salary was $130,000, with a possible bonus of $6,500. According to Keith, the typical life span of a CEO in healthcare is three years, and if the position with Assurance terminated, he would need to find something locally because he did not want to relocate.

**{¶ 34}** During the marriage, Sheryl did not work outside the home, and Keith

---

[3] The amount of child support was not raised as a separate issue.

maintained the family's health insurance through his employment. When the action began in 2015, Sheryl was receiving a total of about $13,314 yearly in taxable income from the Salt River Indian Community, SeaAlaska Corporation, and Gold Belt, and non-taxable income of around $68,285 from land she owned in Arizona. In October 2016, the amount of the nontaxable lease payment increased by about $2,100 per month, meaning that Sheryl was receiving about $93,420 annually in nontaxable payments when she testified at trial in May 2017.

{¶ 35} As noted, this case was pending for a long time. In early January 2019, Keith filed a motion to reduce his child support because he was then unemployed. At a hearing held before a magistrate, the magistrate noted that Keith had been downsized and was looking for a job. February 23, 2019 Hearing Transcript, p. 6. At the hearing, the magistrate indicated that a figure of $150,000 in income would be used for Sheryl, and a figure of $23,088 in unemployment income would be used for Keith. In addition, Sheryl would be ordered to obtain health insurance, and she would be credited for that cost on the child support calculation worksheet. *Id.* During the hearing, *Keith agreed to everything the magistrate read into the record. Id.* at p. 13. He also did not file any objections to the magistrate's decision and order, which was filed on February 20, 2019. *See* Doc. #220. The trial court, therefore, did not err in using $150,000 for Sheryl's income for purposes of the final divorce decree, which was filed about a month after the magistrate's hearing. Thus, there was a disparity, but not the amount that Keith asserts.

{¶ 36} More importantly, the evidence indicates that Keith was capable of earning, and had consistently earned, an income equal to what Sheryl was receiving at the time the divorce decree was filed. Keith had also received a substantial reduction in child

support, and was cohabitating with a woman who was employed, thereby reducing his expenses. As a result, the trial court did not act unreasonably, arbitrarily, or unconscionably in requiring Keith to pay one-half of the medical bills that were incurred during the proceedings. Notably, Keith was not required to pay any medical expenses that were incurred after the hearing on June 18, 2018, even though the divorce was not final until nearly a year later.

**{¶ 37}** As to the bills themselves, the assertions in Keith's brief are incorrect in several respects. First, Keith's comments about Sheryl's testimony are inaccurate. Keith contends that Sheryl knew that she could receive insurance through the Indian Health Service ("IHS"), and had refused to submit all paid claims to this secondary insurance. In contrast, Sheryl testified that while her older children were enrolled in IHS, their minor son was not, and she was *unaware* that IHS can act as a secondary insurance policy. *See* December 21, 2017 Hearing Transcript, pp. 243-244. There was no evidence that Sheryl had refused to submit claims to IHS.

**{¶ 38}** In addition, Sheryl indicated that persons enrolled in IHS can go to a Native American Hospital or clinic. She noted that Ohio has no such facilities and the nearest facility is in Chicago. *Id.* at pp. 248-249. Sheryl also said she was unaware that medical bills can be submitted to IHS for payment if an IHS facility is not nearby. *Id.* at pp. 249-250.[4]

**{¶ 39}** Keith is also incorrect in claiming that the trial court erred in failing to consider his spreadsheet, Ex. BBB, which allegedly summarized all the medical bills and

---

[4] Keith did not submit any evidence that the alleged matters were true; he simply asked, during his pro se cross-examination, if Sheryl were aware of these points.

errors that Keith found. *See* Appellant's Brief, pp. 8-9. Defendant's Ex. BBB was not discussed during any hearings, nor was it admitted into evidence. The binder of Defendant's exhibits does contain a document labeled "Defendant's Ex. BBB." However this document is not a spreadsheet; it is a Bank of America money-market statement for Sheryl for October 22, 2016 to November 21, 2016.

{¶ 40} We have repeatedly stressed that " '[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-16, 2013-Ohio-2341, ¶ 90, quoting *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus.

{¶ 41} In his brief, Keith has provided a list of 11 instances where duplicate exhibits were submitted to substantiate Sheryl's payment of medical expenses. *See* Appellant's Brief at p. 9. According to Keith, if the duplicate exhibits are eliminated, the amount of medical bills would be $7,401.48 less than was found by the trial court. However, we disagree. We have reviewed and compared every exhibit contained in this list, and find Keith's assertions to be incorrect, and in some instances, frivolous.

{¶ 42} For example, the first item in the list claims that Plaintiff's Ex. 1-S is duplicative of Plaintiff's Ex. 1-T. These exhibits involve eye surgery that Sheryl had on August 27, 2015, and visits that occurred before and after surgery. Ex. 1-S lists $784.06 in payments that Sheryl made to Dayton Eye Associates. Ex. 1-T lists payments totaling $491.40 that Sheryl made to Dayton Eye Surgery Center. *See* December 21, 2017 Hearing Transcript, pp. 53-63. Sheryl testified that Plaintiff's Ex. 1-T was not a duplicate of 1-S. *Id.* at p. 219. Keith presented no evidence to dispute this.

**{¶ 43}** Furthermore, during the second day of trial, on May 1, 2017, when Keith was still represented by counsel, the parties presented the trial court with Joint Ex. I, which was a list of issues the parties had resolved. May 1, 2017 Hearing Transcript, p. 18. Among these issues was a list of indebtedness the parties had incurred, which included medical expenses. Expenses for Dayton Eye Associates and Dayton Eye Surgery Center were listed as stipulation numbers 49, 52, 57, 59, 60, 62, and 67. Stipulation #52 stated that "[t]he parties have incurred a Dayton Eye Surgery Center medical bill from November 11, 2015 in the amount of $491.40." Joint Ex. I, p. 6. This is the precise amount that Sheryl requested in Ex. 1-T.

**{¶ 44}** The bills for Dayton Eye Associates were listed *separately* on the joint exhibit as $474.53 (#49) and $261.69 (#57), which total $736.22. This is close to the amount Sheryl claimed she had paid ($784.06). Consequently, Keith's argument is frivolous. The exhibits reflecting payments for these separate items were not duplicated.

**{¶ 45}** Similarly, Plaintiff's Exs. 1-U and 1-V (also part of Keith's first item) do not reflect an attempt to receive duplicate payments for the same charge. Sheryl testified that Ex. 1-U was a bill from Kettering Physician Network for her daughter. December 21, 2017 Hearing Transcript at p. 63. Sheryl requested reimbursement for $268, based on payments of $100 on June 15, 2016, and $168 on November 2, 2016. *Id.* at pp. 62-63. In contrast, Ex. 1-V reflects a payment of $40 on May 18, 2016 for treatment of the daughter. All of these payments related to treatment of the daughter on May 18, 2016. The total charge was $337, and four payments or adjustments were made: (1) a $40 co-pay by Sheryl on the day of treatment; (2) an insurance adjustment of $29 on June 3, 2016; (3) a $100 payment by Sheryl on June 15, 2016; and (4) a payment of $168 by

Sheryl on November 2, 2016. These payments and the adjustment total $337 – the amount of the bill. Again, Keith's argument is frivolous.

{¶ 46} As noted, these two frivolous claims relate to the first item in Keith's 11-item list. Again, we have reviewed all the exhibits in question and have found no duplicates, other than when comparing Plaintiff's Exs. 2-W and 1-W (item (iv) on Keith's list). Ex. 2-W is a series of payments for treatment of the daughter and son by Pediatric Associates of Dayton from August 7, 2015 to March 20, 2017. At trial, Sheryl asked for reimbursement of $554.75 for these appointments, as reflected in Ex. 2-W. *See* December 21, 2017 Hearing Transcript, p. 105. In contrast, Ex. 2-W indicates that Sheryl had made $811.86 in payments for the appointments listed in the exhibit.[5]

{¶ 47} Likewise, Sheryl asked for reimbursement of $246.93, based on Ex. 1-W, which was a check to Pediatric Associates dated September 12, 2015. This check corresponds to the total of payments for three doctor's visits that are listed on pages 13-14 of Ex. 2-W. The $246.93 payment in Ex. 1-W, therefore, could be said to be a duplicate. However, as noted, Sheryl had only asked for payment of $554.75 based on Ex. 2-W.

{¶ 48} A third exhibit, Plaintiff's Ex. 2-J, indicates that Sheryl also paid $66.04 on another bill from Pediatric Associates around February 19, 2017. This was within the March 30, 2017 time frame, meaning that, according to these three exhibits (2-W, 1-W, and 2-J), Sheryl paid a total of more than $867.72 for the Pediatric Associates medical

---

[5] We did not include $42.78 in payments in Ex. 2-W, because they were made for Sheryl's emancipated son.

bills.[6]

{¶ 49} At trial, Sheryl submitted summaries of what she paid for various medical bills. For example, Plaintiff's Ex. 1 summarizes Plaintiff's Exs. 1-A through 1-DD. Likewise, Plaintiff's Ex. 2 summarizes Plaintiff's Exs. 2-1 through 2-HH. On these summaries, *Sheryl only asked for reimbursement of the following amounts for the Pediatric Associates' bills*: (1) $246.93 (Ex. 1-W); (2) $544.75 (Ex. 2-W); and (3) $66.04 (Ex. 2-J). The total of these amounts is $857.72.

{¶ 50} Comparing the amount paid versus the amount requested, Sheryl actually requested, and was awarded, about $20 less than she paid. Accordingly, even if any error occurred, Keith was benefitted. His argument, again, is frivolous. The same type of analysis applies to all the "duplicates" Keith claims. As noted, we have reviewed every claimed duplicate, and the trial court did not credit Sheryl with duplicate payments.

{¶ 51} Keith also contends that the amount of medical expenses should be decreased by $9,115.05 because Sheryl failed to submit claims to the insurance company or failed to submit them in a timely manner. Again, we disagree. According to the evidence, Keith, either through his attorney or directly, was in possession of the medical bills and Keith could have taken action to file claims. Keith should also have known that his wife and children would incur medical expenses during the nearly four-year period before the divorce was granted. Yet, he apparently took no steps to inquire; instead he let Sheryl incur the burden of paying the medical expenses.

{¶ 52} In addition, the trial court repeatedly stressed to Keith during the hearings

---

[6] Contrary to Keith's claim (also part of item (iv)), the payment in Ex. 2-J was not duplicative, as it does not match any of the payments in Ex. 2-W.

that he could file claims for any medical expenses that had not been submitted and keep any money he received. The court also ordered Sheryl to cooperate with Keith in this regard. *E.g.*, December 21, 2017 Hearing Transcript at pp. 215-217 and 250.

{¶ 53} As a final matter, Keith contends that he should have been given credit for more than $10,000 that he paid to Sheryl for medical expenses. As support, Keith cites Defendant's Ex. CCC. This exhibit is a February 2017 bank statement for Sheryl, showing a beginning balance of $25.88 and an ending balance of $632.88. Consequently, it has nothing to do with the alleged $10,000 payments. Keith also failed to offer any testimony indicating that he had made such payments to Sheryl. He could have also submitted his own bills for medical expenses he paid for himself, which would have reduced the amount owed to Sheryl, if he indeed had such expenses. However, no such evidence was offered.

{¶ 54} Based on the preceding discussion, the Second Assignment of Error is overruled.

## IV. Attorney Fees

{¶ 55} Keith's final assignment of error, as we interpret it, states that:

The Trial Court Erred in Awarding Attorney Fees to Sheryl.

{¶ 56} Under this assignment of error, Keith contends that the trial court erred in awarding Sheryl $25,000 in attorney fees because there was a disparity in incomes and there was no evidence during trial that Keith had committed misconduct. Keith further contends that the trial court miscalculated his potential income. This is based on Keith's claim that he would have difficulty duplicating his former income without relocating. In

addition, Keith maintains that Sheryl committed significant misconduct during trial by obtaining repeated continuances, intentionally extending the trial, violating visitation orders, and engaging in criminal acts toward him.

{¶ 57} The trial court concluded, pursuant to R.C. 3105.73(A), that it would be fair and equitable to award attorney fees to Sheryl in lieu of spousal support.  Doc. #221 at p. 4.  After hearing evidence indicating that Sheryl accumulated $59,236.65 in attorney fees, the trial court awarded her $25,000 in attorney fees in lieu of spousal support.  The court ordered Keith to pay these fees at a rate of $1,000 per month until they were paid in full.

{¶ 58} R.C. 3105.73(A) provides that:

In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable.  In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 59} Trial court decisions to award attorney fees are reviewed for abuse of discretion.  *Buckingham v. Buckingham*, 2018-Ohio-2039, 113 N.E.3d 1061, ¶ 104 (2d Dist.), citing *Janis v. Janis*, 2d Dist. Montgomery No. 23898, 2011-Ohio-3731, ¶ 78.  "We may not substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, we conclude that the trial court abused its discretion."  *Janis* at ¶ 78, citing *Holcomb v. Holcomb,* 44 Ohio St.3d 128, 131, 541 N.E.2d 597 (1989).

{¶ 60} In June 2018, the trial court held a hearing on attorney fees. At that time, Sheryl's attorney testified about the amount of his fees through December 21, 2017, which was $59,236.65. He also presented testimony from an experienced local attorney who stated that the case was very complex, and that the bill and the hourly rate of Sheryl's attorney were reasonable and necessary.

{¶ 61} Notably, Keith called his former attorney, Thomas Kopacz, as a witness. Kopacz had handled Keith's case for about a year and a half before leaving the practice of law and withdrawing from representation in June 2017. When the trial judge asked Kopacz if he believed that any of Sheryl's actions were superfluous or unnecessary when he represented Keith, Kopacz said "I don't recall any such event, your Honor. It was a hard fought battle Mr. Kirkland and I were in * * *." June 18, 2018 Hearing Transcript, p. 75.

{¶ 62} During the fee hearing, Keith did not testify and did not introduce any exhibits. Furthermore, the exhibits that Keith discusses in his brief (Defendant's Exs. KK, OO, PP, QQ, RR, LL, DDD, and SS) were not admitted into evidence at trial. As we noted, " '[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Taylor*, 2d Dist. Miami No. 2012-CA-16, 2013-Ohio-2341, at ¶ 90, quoting *Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500, at paragraph one of the syllabus.

{¶ 63} The attempt to admit new evidence applies to many statements in Keith's brief as well, like his comments about matters such as Sheryl changing her address or calling Keith's employer. There was no evidence at trial about these alleged matters. During one hearing, brief testimony about Sheryl's misdemeanor conviction concerned

Exs. OO and PP, but these exhibits were not admitted into evidence. Nonetheless, we fail to see how this criminal conduct impacted Sheryl's attorney fees or prolonged the divorce action.

**{¶ 64}** In any event, the trial court awarded Sheryl less than half the fees she requested. Given the minimal amount of child support, Keith's income potential, and the fact that he was allowed to pay only $1,000 a month, the court's decision was not unreasonable. The trial court also ordered the fees in lieu of spousal support, despite the fact that the parties had been married more than 20 years, and Sheryl had not worked outside the home. Admittedly, Sheryl received income from land she owned. However, no testimony was offered with respect to the nature of the leases that generated the income or how long the income would last.

**{¶ 65}** As an additional point, the trial court noted in the fee hearing that one of the main factors in the delay of the case was Keith's use of multiple attorneys, which caused issues. June 18, 2018 Hearing Transcript, p. 101. Keith also caused delay and additional attorney fees by filing four motions to show cause during the case, none of which were successful – contrary to Keith's assertion about Sheryl's violation of visitation schedules. *See* Appellant's Brief, p.16.

**{¶ 66}** Accordingly, we find no abuse of discretion in the trial court's decision to award attorney fees to Sheryl in lieu of spousal support.


## V. Conclusion

**{¶ 67}** All of Keith's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

James R. Kirkland
Keith A. Kuhn
Hon. Steven L. Hurley