[Cite as *Sanchez v. Casiano*, 2022-Ohio-4179.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JENNIFER GIRON SANCHEZ | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29415 |
| | : | |
| v. | : | Trial Court Case No. 2018-DR-1121 |
| | : | |
| BENNY VAZQUES CASIANO | : | (Appeal from Common Pleas |
| | : | Court – Domestic Relations Division) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of November, 2022.

. . . . . . . . . . .

KEITH A. FRICKER, Atty. Reg. No. 0037355, 10 North Ludlow Street, Suite 920, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

BENNY VAZQUES CASIANO, 5257 Longford Road, Dayton, Ohio 45424
      Defendant-Appellant, Pro Se

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Benny Vazques Casiano appeals from a final judgment and decree of divorce of the Common Pleas Court of Montgomery County, Domestic Relations Division. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.      Facts and Course of Proceedings

{¶ 2} Jennifer Giron Sanchez and Casiano were married on August 29, 2004. Three children were born of the marriage. The oldest child was born in November 2011, and the two youngest were born in May 2013.

{¶ 3} Casiano filed a complaint for divorce on November 8, 2016, in Case No. 2016-DR-993. Sanchez filed a counterclaim and received temporary custody of the children. On December 12, 2016, the parties jointly dismissed the case.

{¶ 4} Sanchez filed a complaint for divorce on December 21, 2018. She also filed a motion for temporary restraining orders and a request to be the temporary custodial parent, which the trial court granted. Three months later, Casiano filed his answer and counterclaim and a motion for a temporary restraining order, which the trial court granted. Over the next two years, both parties filed motions for contempt and motions for continuances. During this time, the trial court ordered mediation, which was unsuccessful.

{¶ 5} A hearing on the complaint and counterclaim was held before a magistrate on September 21 and October 19, 2020, and February 23, 2021. On March 24, 2021,

the magistrate awarded custody of the three children to Sanchez and awarded Casiano standard parenting time. The magistrate also awarded spousal support to Casiano, awarded child support to Sanchez, and set forth the property division. Both parties filed objections to the magistrate's decision.

{¶ 6} On October 28, 2021, the trial court issued a decision overruling the parties' objections to the magistrate's decision as they related to custody and child support but sustaining their objections as they related to the division of a retirement account and an IRA. Casiano filed a notice of appeal from the trial court's decision (Montgomery C.A. No. 29313). We ordered Casiano to show cause why the appeal should not be dismissed for lack of jurisdiction, and on February 7, 2022, we dismissed the appeal; we concluded that the October 28, 2021 decision was not a final appealable order, because it anticipated the later filing of the final divorce decree.

{¶ 7} On February 8, 2022, the trial court filed an "Amendment to October 28, 2021 Decision." The trial court corrected a mathematical error and a portion of the child support order. The next day, the trial court issued its final judgment and decree of divorce. The trial court designated Sanchez as the residential parent and legal custodian of the children, ordered Casiano to pay $987.01 per month in child support, ordered Sanchez to pay $719.20 per month in spousal support for 56 consecutive months, and divided the parties' property. Casiano filed a timely notice of appeal from the trial court's judgment.

II. Assignments of Error

{¶ 8} Casiano lists the following three assignments of error at the beginning of his appellate brief:

THE TRIAL COURT ERRED TO PRESERVE THE LEGAL PROCESS, APPELLANTS, PARENTAL CIVIL, AND CONSTITUTIONAL RIGHTS, WITHOUT GOOD REASON, FAILED TO DISPOSE OF JUDICIAL MATTERS PROMPTLY, EFFICIENTLY, AND FAIRLY. WHEREFORE THE APPELLANT'S CHILDREN'S BEST INTEREST REMAINS UNPROTECTED.

THE TRIAL COURT FINAL JUDGMENT AND DECREE FACTORS EXCLUDED PROCESSED HEARINGS, AFFIDAVITS, EVIDENCE, STATEMENTS, AND COURT-APPROVED IN GOOD-CAUSE PENDING MOTIONS. THE TRIAL COURT'S FINDINGS OF FACTS GO AGAINST PHYSICAL, DOCUMENTARY EVIDENCE.

THE TRIAL COURT FINAL JUDGMENT AND DIVORCE DECREE DETERMINATIONS REGARDING CUSTODY; SUPPORT; EQUITABLE DIVISION OF ASSETS & LIABILITIES; WERE ISSUED OUTSIDE OF THE LIMITS AS DEFINED BY CONSTITUTIONAL AND STATUTORY LAW, BASED ON THE KNOWN FACTS AND CIRCUMSTANCES THAT EXISTED AT THE TIME IT WAS FILED. THE APPELLANT BELIEVES THE TRIAL COURT FAILED TO DILIGENTLY DISCHARGE ADMINISTRATIVE RESPONSIBILITIES WITHOUT BIAS.

{¶ 9} Casiano's brief fails to comply with App.R. 16 in many respects. For

example, his brief did not contain page numbers, a table of contents, or a table of cases. Further, his assignments of error do not reference the place in the record where each error is reflected, and there is no statement of issues presented for review with references back to the assignments of error to which each issue relates. Rather, Casiano's appellate brief contains several lengthy statements and quotes that often are a stream of consciousness rather than a legal argument. Despite these deficiencies in Casiano's brief, we will address his most notable general contentions and then conduct a review of the issues he identifies in his third assignment of error: custody, support, and asset division.

### a. General Contentions

{¶ 10} Casiano contends several times in his appellate brief that the trial court is biased against fathers. For example, on the last page of his brief, he states that the trial court "made a presumption that children should only live with their mother and perhaps see their father every other weekend, thus it did not treat mother and father equally regarding 'due process' on custody, support, division of assets and liabilities." Casiano does not point to any evidence of record supporting this allegation. Further, our review of the transcript reveals that the magistrate assisted Casiano several times with focusing his presentation of evidence and helping him calm down when he got agitated by opposing counsel. Also, the magistrate gave Casiano latitude with regard to admitting items into evidence. While it is understandable that parties will be upset when rulings are unfavorable to them, we see no evidence of bias or improper presumptions on the

part of the magistrate or the trial court.

{¶ 11} Casiano also complains several times in his appellate brief about how much time passed between the filing of Sanchez's complaint for divorce and the final judgment issued by the trial court. Casiano concluded his brief by stating:

> The court offered no explanation regarding the 1146 days pending Judgment, because there is no reason for it. It is an intentional undeserved punishment decision against the outspoken Hispanic Ex-Parte litigant that does not want to accept lawless and senseless abusive conditions the court is enforcing upon his children.

{¶ 12} Once again, there is no evidence in the record that any rulings by the magistrate or trial court were motivated by any animus toward Casiano. While the period between the filing of the complaint and the final judgment was lengthy, this can often be the case when parties get contentious in divorce proceedings, especially when custody issues are involved. For example, the parties filed numerous motions and documents with the trial court. Further, this case was pending during a global pandemic, which caused much disruption in society as well as in the judicial system. Given these facts, it is not surprising that the case took longer to reach a conclusion. We do not see any evidence in the record that any delay in the resolution of the divorce was caused by bias of the magistrate or the trial court against Casiano.

{¶ 13} Finally, Casiano complains that on February 24, 2019, the trial court "filed an impetuous 'emergency' EX-PARTE 'Temporary' Custody and Support Order in benefit of [Sanchez]." We are unable to find in the record any filing made on February 24, 2019.

We have reviewed a February 26, 2019 request for a restraining order that was filed by Casiano and was granted by the trial court on that same day. The only other filing to which Casiano may be referring is a January 24, 2019 order granting temporary custody of the minor children to Sanchez and awarding temporary child support in the amount of $816 per month. In its January 24, 2019 order, the trial court ordered the Support Enforcement Agency to take "NO enforcement action on temporary support orders." Casiano has failed to establish how the trial court's January 24, 2019 order was improper or contrary to law. Rather, Casiano sought similar relief in his February 26, 2019 filing. We conclude that Casiano has failed to identify any prejudicial error resulting from an "impetuous 'emergency' EX-PARTE 'Temporary' Custody and Support Order."

### b. Custody

{¶ 14} Casiano contends that the trial court "made a presumption outside of the law that children should only live with their mothers and perhaps see their fathers every other weekend." According to Casiano, he should have been awarded custody of the children because Sanchez's "behavior is a clear indication that she is the uninvolved parent who is neglectful and fails to respond to their child's needs beyond the basics of shelter, food, and clothing."

{¶ 15} Trial courts have substantial discretion in making a custody decision, and we review the court's decision for an abuse of discretion. *In re M.W.*, 2d Dist. Montgomery No. 26912, 2016-Ohio-4891, ¶ 58. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Citation omitted.)

*AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).   The Supreme Court has stressed that "most instances of abuse of discretion will result in decisions that are simply unreasonable."   *Id.*   "A decision is unreasonable if there is no sound reasoning process that would support that decision."   *Id.*

{¶ 16} When trial courts make decisions regarding custody of children, they "must do so in accordance with the 'best interest of the child' standard set forth in R.C. 3109.04(F)(1)."   *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9, citing *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), and R.C. 2151.23(F)(1).   R.C. 3109.04(F)(1) provides that the trial court shall consider all relevant factors when determining the best interest of a child.   That section provides the following non-exhaustive list of factors to consider: (a) the wishes of the child's parents; (b) the wishes and concerns of the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other

parent's right to parenting time in accordance with an order of the court; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 17} In its March 24, 2021 decision, the magistrate analyzed each of these factors. Then, in its October 28, 2021 decision, the trial court identified the factors in R.C. 3109.04(F)(1) and discussed the evidence of record relevant to these factors. The trial court summarized the evidence as follows:

> Both Jennifer [Sanchez] and Benny [Casiano] wish to be the sole legal custodian of the children and assert they were the primary caregiver for the children during the marriage. Jennifer believes that Benny should not receive any parenting time. She states that it's confusing when the children spend time with Benny because they do not have the same structure at his house as they do at hers. She thinks that Benny talks poorly of her to the children and needs to take anger management and parenting classes. If he did so, she would accept the children spending one weekend per month with him. Benny is not opposed to Jennifer having the children 50 percent of the time, however, he wants to make all the decisions regarding the children. He thinks that Jennifer is too controlling.

> All three children are in good health and excel in school. They earn straight A's and have received awards since attending their current school, Temple Christian. Jennifer is very involved with the school. She attends the parent teacher conferences and volunteers in exchange for tuition

credits. Jennifer managed the children's education during the COVID-19 Pandemic when the children had to switch to homeschooling. Benny has not participated in the parent teacher conferences, but attended a "Donuts with Dad" after school event.

Benny has been late for various parenting time exchanges. During parenting time exchanges, he admits that he has driven his truck onto Jennifer's front lawn when the end of the driveway has been blocked, stating that Jennifer blocks the driveway to antagonize him. Benny claims that Jennifer has denied him parenting time, however she argues that he missed parenting time because he did not pick up the kids.

When the children return home from parenting time, Jennifer says that they shut down for a little bit and she has to "switch them out of the, the mentality that they're in when they come home." (Transcript, p. 172). Jennifer expressed concern about the children's safety while at Benny's home, stating the children have returned home with ailments on numerous occasions. Recently, [one child] was injured at Benny's after his brother accidentally hit him in the face with a stick. Benny placed a bandage on the split eyebrow. Jennifer points out that she then took [the injured child] to the emergency room where he received four stitches.

Jennifer was granted a Domestic Violence Civil Protection Order against Benny in 2019. She asserts that Benny abused her during the marriage and has issues controlling his anger. Benny denies the

accusation.

After consideration of the factors set forth in R.C. 3109.04(F)(1), this Court finds that it is in the best interest of the children for Jennifer to be designated their sole legal custodian, and for Benny to receive the Standard Order of Parenting Time. This decision is based on the totality of the circumstances, and no one factor on its own.

October 28, 2021 Decision, p. 14-15.

{¶ 18} The trial court properly considered the factors set forth in R.C. 3109.04(F)(1). The trial court credited the testimony of Sanchez over Casiano relating to the allegations of Casiano's losing his temper and not participating as much as Sanchez in their children's education. Casiano's actions had been the subject of a domestic violence civil protection order. Further, Casiano's own testimony demonstrated that he lost his temper on several occasions when picking the children up from Sanchez's residence. Tr. p. 259. He had driven his vehicle into Sanchez's yard, because he believed that she had intentionally blocked access to her driveway. He had also cut up new underwear that was given to his children by Sanchez's co-worker, Jackie Sukup. *Id.* at 261. Sukup testified at the hearing that Casiano had cut up the underwear and thrown the remains on Sanchez's driveway. *Id.* at 29-30. She also confirmed that Casiano had driven through Sanchez's grass when he picked up the children. *Id.* at 30-32.

{¶ 19} We defer to the trial court's credibility determinations, because it is "best able to view the witnesses and observe their demeanor, gestures, and voice inflections,

and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferential review in a child custody determination is especially crucial "where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶ 20} Based on the record before us, we cannot conclude that the trial court abused its discretion in crediting Sanchez's testimony over Casiano's and in finding that an award of custody to Sanchez was in the best interest of the children.

### c. Voluntary Unemployment and Support Calculation

{¶ 21} The trial court imputed $60,000 of income to Casiano and used this amount of income in its calculations of child support and spousal support. Casiano contends that the trial court's decision to impute $60,000 of income to him was improper, because he was not voluntarily unemployed, as evidenced by the fact that he was receiving unemployment benefits from the State of Ohio.

{¶ 22} Chapter 3119 governs child support orders. In contrast to the spousal support statute, which directs the court to examine the relative earning abilities of the parties, R.C. 3119.01 includes consideration of the "potential income" of a parent as well as the actual gross income earned by the parent when calculating child support. This statutory scheme contemplates arriving at a total income figure, which is entered into a child support worksheet. The worksheet contains standard adjustments for various items such as health care costs and childcare. After making all the required adjustments,

the computed amount becomes the presumptively correct amount of child support. *See* R.C. 3119.023; R.C. 3119.03.

{¶ 23} R.C. 3119.01(C)(9) defines "income" as used in Chapter 3119 as:

(a) For a parent who is employed to full capacity, the gross income of the parent;

(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.

{¶ 24} R.C. 3119.01(C)(12) defines "gross income" as "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable[.]" The definition broadly identifies a wide spectrum of types and sources of income but excludes sources such as government disability benefits and nonrecurring or unsustainable income or cash flow. R.C. 3119.01(C)(12)(a)-(g).

{¶ 25} If a parent is unemployed or underemployed, "income" is defined differently. Under those circumstances, "income" is "the sum of the gross income of the parent and any potential income of the parent." R.C. 3119.01(C)(9)(b). For a parent who the court determines is voluntarily unemployed or underemployed, R.C. 3119.01(C)(17) defines "potential income" as the total of two items: (1) "imputed income" that the court determines the parent would have earned if fully employed, as determined from 11 criteria, 3119.01(C)(17)(a)(i)-(xi); and (2) imputed income from non-income-producing assets of a parent, if the income is significant. R.C. 3119.01(C)(17)(b).

{¶ 26} If the court determines that a parent is voluntarily unemployed or voluntarily underemployed, then it must determine that parent's potential income. Under R.C.

3119.01(C)(17)(a), potential income will include imputed income that the parent would have earned if fully employed as determined from the criteria listed in R.C. 3119.01(C)(17)(a)(i)-(xi). These criteria include consideration of: (i) the parent's prior employment experience; (ii) the parent's education; (iii) the parent's physical and mental disabilities, if any; (iv) the availability of employment in the geographic area in which the parent resides; (v) the prevailing wage and salary levels in the geographic area in which the parent resides; (vi) the parent's special skills and training; (vii) whether there is evidence that the parent has the ability to earn the imputed income; (viii) the age and special needs of the child for whom support is being calculated; (ix) the parent's increased earning capacity because of experience; (x) the parent's decreased earning capacity because of a felony conviction; and (xi) any other relevant factor. R.C. 3119.01(C)(17)(a)(i)-(xi).

{¶ 27} In its March 24, 2021 decision, the magistrate noted that the court should consider the factors set forth in R.C. 3119.01(C)(17) when addressing voluntary underemployment and the imputation of income. Ultimately, the magistrate found that Casiano was "voluntarily unemployed. He was fired from his previous employer, Wesbanco, for not following company rules. He obtained other employment but left that job voluntarily because of COVID. Income should be imputed to him at the rate of $60,000 per year, what he made for WesBanco." Magistrate's Decision, p. 20. The magistrate gave no explanation for why it chose $60,000 as the correct imputed income other than noting that this amount was what Casiano earned at WesBanco before being fired in March 2019.

{¶ 28} Casiano filed an objection to the magistrate's finding that he was voluntarily unemployed. In ruling on the objection, the trial court first addressed whether Casiano had an objectively reasonable basis for terminating or otherwise diminishing his employment. The trial court concluded that Casiano had not had an objectively reasonable basis and therefore it was proper to impute income to him. The trial court overruled Casiano's objection, finding that:

> Although he says that he is unemployed to stay home with the children, and is specifically trying to find employment where he can work from home due to COVID-19, these reasons do not outweigh the need for him to financially support his children. Accordingly, the Magistrate did not err in finding Benny voluntarily unemployed and by imputing an annual salary of $60,000 per year, which he had earned at Wesbanco prior to being terminated[.]

October 28, 2021 Decision, p. 16.

{¶ 29} It appears that the trial court, like the magistrate, failed to consider the factors set forth in R.C. 3119.01(C)(17)(a)(i)-(xi) when determining that $60,000 was the proper amount of income to impute. Casiano testified that he had not stopped looking for work and had concentrated on jobs that would allow him to work remotely. He stated that he had sent out over 350 applications to potential employers. Tr. p. 276, 288-289. Casiano testified that his $60,000 salary at WesBanco had been a higher salary than he could receive at comparable jobs in the industry, because he had only earned that much at WesBanco as a result of being with the company for over ten years. *Id.* at 276, 289-

290. Casiano subsequently held a job at Lexur Appraisal and made $37,000 per year. But he left that job when he was unable to afford the price of the test to become an appraiser. *Id.* at 287.

{¶ 30} Considering Casiano's testimony, we are troubled by the trial court's failure to explain why it imputed $60,000 of income to Casiano. The trial court did not provide any analysis of the statutory factors in R.C. 3119.01(C)(17)(a)(i)-(xi) before arriving at this amount of imputed income. We acknowledge that there did not appear to be a plethora of evidence submitted by the parties relating to the factors set forth in R.C. 3119.01(C)(17)(a). However, that did not relieve the trial court of its responsibility to consider the factors set forth in the statute when calculating the proper amount of income to impute.

{¶ 31} Given the record before us, we must conclude that the trial court abused its discretion in imputing $60,000 of annual income to Casiano. We will remand to allow the trial court the opportunity to make a calculation of what income should be imputed to Casiano based on the specific statutory factors listed in R.C. 3119.01(C)(17)(a)(i)-(xi). We encourage the trial court to accept additional evidence from the parties on this issue if it deems the current record insufficient to adequately address the statutory factors. Once the trial court makes its finding as to how much income to impute to Casiano, the trial court shall adjust its child support and spousal support calculations accordingly.

d. Equitable Division of Property

{¶ 32} Casiano contends that the trial court erred in its division of marital property.

R.C. 3105.171(B) states, in pertinent part: "[i]n divorce proceedings, the court shall * * * determine what constitutes marital property and what constitutes separate property. * * * [U]pon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section." Further, R.C. 3105.171(C) provides:

> Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section.

{¶ 33} "Generally, a court dividing property upon divorce must award each spouse his or her separate property." *Harrington v. Harrington*, 4th Dist. Gallia No. 08CA6, 2008-Ohio-6888, ¶ 11, citing R.C. 3105.171(D). "There is a presumption in Ohio that an asset acquired during the course of the marriage is marital property, unless proved otherwise." *Tincher v. Tincher*, 5th Dist. Fairfield No. 2019 CA 28, 2020-Ohio-3352, ¶ 63, citing *Haven v. Haven*, 5th Dist. Ashland No. 12-COA-013, 2012-Ohio-5347, ¶ 23. Correspondingly, the definition of "separate property" includes "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage[.]" R.C. 3105.171(A)(6)(a). "The party to a divorce action seeking to establish that an asset or a portion of an asset is separate property, rather

than marital property, has the burden of proof by a preponderance of the evidence." (Citations omitted.) *Tincher* at ¶ 64.

{¶ 34} "A domestic relations court is vested with broad discretion to determine what constitutes an equitable division of property in a divorce proceeding, and its exercise of discretion will not be disturbed on appeal in the absence of some demonstration that the court abused its discretion." *Jelen v. Jelen*, 86 Ohio App.3d 199, 203, 620 N.E.2d 224 (1st Dist.1993), citing *Martin v. Martin*, 18 Ohio St.3d 292, 480 N.E.2d 1112 (1985). "In determining whether the trial court abused its discretion, a reviewing court cannot examine the valuation and division of a particular marital asset or liability in isolation; rather, the reviewing court must view the property division in its entirety, consider the totality of the circumstances, and determine whether the property division reflects an unreasonable, arbitrary or unconscionable attitude on the part of the domestic relations court." *Jelen* at 203, citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 459 N.E.2d 896 (1984).

{¶ 35} Casiano raises two primary arguments that the trial court failed to equitably divide the parties' property. First, Casiano contends that the trial court erred by awarding Sanchez 75% of the value of the real property located at 5720 Owl Court. According to Casiano, the trial court improperly accounted only for the equity in the real estate rather than the entire value of the real estate.

{¶ 36} The trial court found that the property at Owl Court was valued at $145,000 and the parties owed $73,003.07 on a mortgage on the property, leaving $71,996.93 in equity. The trial court then found that Casiano's marital portion of the equity was $35,998.48, but that he had already received $8,000 for his interest in the property.

Therefore, the court found that Casiano was entitled to $27,998.47 relating to the Owl Court property. The trial court's finding was supported by the evidence. Further, the trial court's decision to split the equity rather than the total value of the property was proper. Otherwise, Casiano would have received the benefit of the total value of the house without having any responsibility for the sizable mortgage on the house.

{¶ 37} Casiano also contends that the trial court used an incorrect separation date when valuing the property at issue in the divorce. According to Casiano, both parties testified that the separation date was in June 2018. Therefore, the trial court erred in choosing March 2018 as the separation date and the de facto termination of marriage date.

{¶ 38} R.C. 3105.171(A)(2) establishes that a final divorce hearing date is determinative for property valuation purposes unless the trial court concludes use of that date to be inequitable. Indeed, the Supreme Court of Ohio has noted that equity sometimes demands that the trial court utilize a de facto marriage termination date in its asset valuation. *Berish v. Berish*, 69 Ohio St.2d 318, 321, 432 N.E.2d 183 (1982). The Court explained:

The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations. The public policy giving rise to equitable distribution is at least in part an acknowledgment that marriage is a shared enterprise or joint undertaking. While marriage is literally a partnership, it is a partnership in which the contributions and equities of the partners do

differ from individual case to individual case. Assets acquired by the joint efforts of the parties should be, on termination, eligible for distribution. But the precise date upon which any marriage irretrievably breaks down is extremely difficult to determine, and this court will avoid promulgating any unworkable rules with regard to this determination. It is the equitableness of the result reached that must stand the test of fairness on review.

*Id.* at 319-320. An appellate court may not overturn a trial court's determination of a de facto termination date for a marriage if there is any evidence in the record to support it. *Marini v. Marini*, 11th Dist. Trumbull Nos. 2005-T-0012 and 2005-T-0059, 2006-Ohio-3775, ¶ 12.

{¶ 39} In its March 24, 2021 decision, the magistrate identified March 1, 2018, as the date of separation and the de facto termination of marriage date. Casiano and Sanchez filed objections to the magistrate's decision. Then Sanchez filed supplemental objections, and Casiano filed responses to Sanchez's two sets of objections. At no point in any of the objections, supplemental objections, or responses to the objections did either party raise an objection to the magistrate's finding that March 1, 2018, was the correct separation date and de facto termination of marriage date. Given Casiano's failure to object to the magistrate's finding, he forfeited the right to assign this issue on appeal. Civ.R. 53(D)(3)(b); *Adams v. Adams*, 9th Dist. Wayne No. 13CA22, 2014-Ohio-1327, ¶ 6, citing *Kiewel v. Kiewel*, 9th Dist. Medina No. 09CA0075-M, 2010-Ohio-2945, ¶ 17. Further, Casiano does not allege plain error or present a plain error analysis. Therefore, we will not reverse the trial court's finding that March 1, 2018, was the de facto termination

of marriage date.   *Id.*

III.     Conclusion

**{¶ 40}** The trial court's decision to impute $60,000 of income to Casiano without considering the factors set forth in R.C. 3119.01(C)(17)(a)(i)-(xi) constituted an abuse of discretion.   Therefore, we reverse the trial court's judgment insofar as it relates to child and spousal support calculations and remand the matter for the trial court to calculate the proper amount of income to impute to Casiano based on the statutory factors.   In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Keith A. Fricker
Benny Vazques Casiano
Hon. Denise L. Cross