[Cite as *Robinson v. Robinson*, 2023-Ohio-1233.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| JOSEPH S. ROBINSON | : | |
| | : | |
| Appellant | : | C.A. No. 29609 |
| | : | |
| v. | : | Trial Court Case No. 2020 DR 00138 |
| | : | |
| AMY M. ROBINSON | : | (Appeal from Common Pleas Court- |
| | : | Domestic Relations) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 14, 2023

. . . . . . . . . . .

TYRONE P. BARGER, Attorney for Appellant

JAMES D. MILLER, II, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Joseph S. Robinson ("Joseph") appeals from a final judgment and decree of divorce issued by the domestic relations court that divided the parties' property, designated Amy Robinson ("Amy") as the legal custodian and residential parent of their children, and ordered child support and spousal support and the division of property. For the reasons that follow, the judgment of the trial court is affirmed.

## I. Factual and Procedural History

{¶ 2} Joseph filed a complaint for divorce on February 20, 2020. The parties were married on December 5, 2009, and two children were born of the marriage: a son in November 2012 and a daughter in February 2015.

{¶ 3} After discovery and various pretrial proceedings, the final hearing commenced on August 2, 2021, with Joseph presenting his case. On February 25, 2022, Joseph filled a motion to continue the remainder of the trial, which was scheduled for March 15, 2022. Amy responded to the motion on February 28, 2022, noting that the matter had been pending for two years. The court denied Joseph's request for a continuance. The matter proceeded to a continuation of the final hearing on March 15, 2022.

{¶ 4} On August 30, 2022, the court issued a decision on all contested matters, which it incorporated into the final decree of divorce. The court found that the date of the final hearing, March 15, 2022, was the marriage termination date, designated Amy as the residential parent of the two children, and issued orders relating to parenting time, child support, spousal support, and the division of property not otherwise agreed to by the parties. The court noted that the parties read a partial agreement as to certain matters into the record prior to the start of the hearing and ordered that its terms be incorporated into the final judgment and decree of divorce. On September 28, 2022, the court issued a final judgment and decree of divorce and an order to seek work to Joseph.

{¶ 5} Joseph appeals, challenging several aspects of the trial court's judgment.

I.      **Arguments and Analysis**

**{¶ 6}** Joseph asserts seven assignments of error on appeal.   His first assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY USING MARCH 15, 2022 INSTEAD OF EITHER JANUARY 1, 2020, FEBRUARY 20, 2020, OR FEBRUARY 21, 2020 AS THE DATE FOR THE TERMINATION OF THE MARRIAGE THUS INAPPROPRIATELY AWARDING AN EQUALIZING OF EQUITY IN VEHICLES PURCHASED BY HUSBAND SUBSEQUENT TO THE TERMINATION OF THE MARRIAGE AND THAT AMOUNT ORDERED BY HUSBAND TO PAY WIFE WOULD NOT BE FAIR AND EQUITABLE.

**{¶ 7}** Joseph argues that the trial court determined that the term of the parties' marriage was from December 5, 2009, through the final hearing date of March 15, 2022, "in spite of the parties and their attorneys uniformly agreeing that the date for the termination of the marriage was no later than February 21, 2020, when Amy left the marital residence."   Joseph argues that the trial court abused its discretion in using March 15, 2022 as the date of the end of the marriage, claiming that the length of time between the filing of the divorce complaint and Amy's vacation of the marital residence was approximately two years prior to March 15, 2022, and that vehicles purchased after February 21, 2020 should not have been considered marital property because they were not purchased "during the marriage," pursuant to R.C. 3105.171(A)(2)(a).

{¶ 8} Amy responds that the transcript of the final hearing "establishes that there was *not* an agreement" regarding the end date of the marriage and that there was no dispute that certain vehicles were purchased between the time she left the marital residence in February 2020 and the final hearing on March 15, 2022. She asserts that these vehicles were subject to equitable division. Amy notes that Joseph has not raised the impact of the termination date of the marriage as to the division of the parties' debt, and that some of the marital debt the court divided, particularly Joseph's 2020 federal tax debt, was accumulated after the date he asserts should have been used as the end of marriage date. Amy argues that Joseph's "position is that [she] should not be awarded a share in the equity in the vehicles purchased after early 2020 while at the same time accepting that she should be partially responsible for debts accumulated after that time."

{¶ 9} As this Court has noted:

Any property or an interest therein that either spouse owns when the marriage terminates is presumed to be marital property. R.C. 3105.171(A)(3)(a). Marital property must be divided per R.C. 3105.171(B) and (C), unless it is one of the seven forms of separate property identified in R.C. 3105.171(A)(6)(a), which must instead be disbursed to the spouse who owns it. R.C. 3105.171(D).

*Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 20 (2d Dist.).

{¶ 10} R.C. 3105.171(A) provides in part:

(A) As used in this section:

\* \* \*

(2) "During the marriage" means whichever of the following is applicable:

(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶ 11} As noted by the Eleventh District:

The analysis in determining a "de facto" termination date for a marriage is, essentially, factual, and includes: (1) whether the parties separated; (2) whether they made an attempt at reconciliation; (3) whether they continually maintained separate residences; and, (4) whether they maintained separate business or financial arrangements. *Marini* at ¶ 13. An appellate court may not overturn a trial court's determination of a de facto termination date for a marriage, if there is any evidence in the record to support it. *Id.* at ¶ 12.

*Nitschke v. Nitschke*, 11th Dist. Lake No. 2006-L-198, 2007-Ohio-1550, ¶ 26, citing *Marini v. Marini*, 11th Dist. Lake Nos. 2005-T-0012 and 2005-T-0059, 2006-Ohio-3775.

{¶ 12} "We review a trial court's selection of a marriage termination date under R.C. 3105.171 for an abuse of discretion." *Davis v. Davis*, 2d Dist. Clark No. 2011-CA-71, 2012-Ohio-418, ¶ 28. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id*.

{¶ 13} Amy testified about the circumstances surrounding her departure from the marital residence as follows:

Q. * * * Why did you leave?

A. * * * We talked about taking the kids over to my apartment to gently introduce them into a new setting, talk to them about it, make it easier for them and for us.

Um, the following day - - following night [Joseph] became very drunk, was following me from room to room, wouldn't let me sleep, was cussing me, calling me all sorts of names, and took my phone, wouldn't allow me to have it. Chased me up the stairs, told me I couldn't leave the house; if I left, it would be considered abandonment of the children, and I would never see them again.

I then sent a message to my friend off my Apple watch, and she called the police.

Q. * * * And the police arrived, and that's when you left?

A. That's correct.

{¶ 14} While the parties agreed that Amy left the home on February 21, 2020, Amy did not agree that the marriage terminated on that date, and Joseph mischaracterizes the record to so argue. Counsel for Joseph represented to the court that Joseph believed the marriage had ended when Amy "both physically and emotionally left the relationship" in approximately November or December 2019. Counsel stated that Joseph proposed that January 1, 2020, be used as the termination date of the marriage. However, the record contains no agreement by Amy or her counsel as to the use of that date for termination date of the marriage.

{¶ 15} The trial court found that the proceedings had been delayed, in part, due to various actions on Joseph's part relating to discovery. On February 23, 2021, Amy filed a motion to compel discovery, and the court granted the motion. On March 23, 2021, Amy moved the court for sanctions for Joseph's failure to comply with discovery. On July 20, 2021, Joseph filed a motion to compel. On July 23, 2021, Amy filed a notice of compliance with discovery and a renewed motion for sanctions; she argued that Joseph had only provided five months of his business bank account records despite her request for three years of said records. She also asserted that he had revealed a bank account through USAA but had failed to provide any records for the account, "claiming for the first time that said records [were] inaccessible to him due to an ongoing federal investigation into said accounts for fraud."

{¶ 16} We conclude that the trial court did not abuse its discretion in its

determination that the de facto termination date of the parties' marriage was March 15, 2022, the date of the final hearing. Joseph's argument ignores the trial court's finding that he refused to comply with discovery, creating unnecessary delays in the proceedings. Further, Amy was forced to leave the marital home due to Joseph's threatening behavior toward her. We conclude that, consistent with R.C. 3105.171(A)(2)(a), it was within the court's broad discretion to determine, in dividing the vehicles, that the vehicles were purchased "during the marriage," which terminated on March 15, 2022. Joseph's first assignment of error is overruled.

{¶ 17} We will consider Joseph's second and third assignments of error together. They are as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT AWARDED SOLE CUSTODY TO AMY.

THE TRIAL COURT ABUSED ITS DISCRETION IN MODIFYING THE 50/50 PARENTING SCHEDULE THAT WAS SUCCESSFULLY UTILIZED BY THE PARENTS ON A TEMPORARY BASIS FOR OVER TWO YEARS.

{¶ 18} In his second assigned error, Joseph asserts that the trial court abused its discretion in awarding custody of the children to Amy because he had been "actively involved in the co-parenting of the children" and "in working through several health care diagnoses for his son." He points out that he works from his home and can adjust his work schedule to his children's needs, whereas Amy has a rotating work schedule that requires her to work 12-hour shifts.

{¶ 19} In his third assignment of error, Joseph cites R.C. 3109.051 and asserts that "each and every one of the factors" in the statute favored keeping the temporary schedule, which was akin to shared parenting, rather than reducing his parenting time by naming Amy the residential parent.

{¶ 20} R.C. 3105.21 provides: "Upon satisfactory proof of the causes in the complaint for divorce, * * * the court of common pleas shall make an order for the disposition, care, and maintenance of the children of the marriage, as is in their best interests, and in accordance with section 3109.04 of the Revised Code."

{¶ 21} R.C. 3109.04(F)(1) provides that the trial court shall consider all relevant factors when determining the best interest of a child. That section contains the following non-exhaustive list of factors to consider: (a) the wishes of the child's parents; (b) the wishes and concerns of the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and (j) whether

either parent has established a residence, or is planning to establish a residence, outside this state. *Sanchez v. Casiano,* 2d Dist. Montgomery No. 29415, 2022-Ohio-4179, ¶ 16.

{¶ 22} "The court has two choices in this regard – either ordering shared parenting or giving residential and legal custody to one parent." *Sivertsen-Kuhn v. Kuhn*, 2d Dist. Greene No. 2019-CA-17, 2019-Ohio-3525, ¶ 9. Further,

> * * * If neither parent files a pleading or motion in accordance with R.C. 3109.04(G) requesting the court to grant both parents shared parental rights and responsibilities for care of the children, the court "shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children." R.C. 3109.04(A)(1).

*Bowling v. Bowling*, 2d Dist. Greene No. 2014-CA-53, 2015-Ohio-2780, ¶ 9.

{¶ 23} At the final hearing, Joseph testified that "shared parenting is what has been happening" and asked that the court continue what the parties had been doing "for the last 20 months." However, as the trial court noted, Joseph never filed a shared parenting plan, and the court was required, pursuant to R.C. 3109.04(G), to award custody to one of the parties. The court considered a variety of information and evidence in reaching its custody determination.

{¶ 24} The record indicates that, while the divorce was pending, the parties attempted to "equalize parenting time"; as a baseline, Amy had parenting time on her days off, and Joseph had parenting time when Amy was working.  Agreed Temporary Orders (Oct. 13, 2020).  The record also reflects that the parties had significant disagreement about communication with the children during the other party's parenting time and other issues.  The temporary order provided that each party would be entitled to electronic or telephone communication with the children twice a day while they were in the other parties' care. The order also limited the parties' communication with each other "to issues concerning the children or shared financial matters only and shall be in text or email only."  *Id.*

{¶ 25} In April 2021, Amy sought to have Joseph found in contempt for his "willful refusal to abide by the communication provisions" contained within the parties' agreed temporary orders, because he had refused to allow her to communicate with the children while they were in his care.   Amy also requested that the parties exchange the children curbside and that specific times and durations of the parties' electronic or telephone communication be established.   On July 6, 2021, the parties filed an agreed order that they would communicate with each other through OurFamilyWizard and that pick up and drop off for parenting time would be curbside at Joseph's home, with him remaining inside the house and Amy remaining in the car.

{¶ 26} The guardian ad litem (GAL) recommended that Amy be designated the residential parent and legal custodian of the children.   He noted that Amy and Joseph continued to struggle to communicate and that Joseph used "completely inappropriate"

language when communicating with Amy. The GAL also noted that the parties disagreed regarding medical treatment for their son, and that "a primary voice [was] needed long term rather than the parents continuing with a power struggle." The GAL expressed concern over the parenting time schedule in place while the divorce was pending, because it varied from week to week and was "required to be exactly equal every month," which resulted in unnecessary "back and forth" during the week and was not in the children's best interest. The GAL recommended in his report that, given the lack of effective communication between the parties, "shared parenting should not be considered" for this family.

{¶ 27} Therapist Susan Davis testified that she had been treating the children since September 2020 and saw them regularly. She testified that the children had expressed confusion about their schedule and that "neither of them ever know when they're going to either house." Davis testified that she had observed that the parties did not get along well in front of the children.

{¶ 28} Amy stated that she opposed the "50/50 time split," because it was "absolutely miserable for the children." Regarding her own ongoing communication with Joseph, Amy requested they use OurFamilyWizard as the exclusive means of communicating and that such communications should be regarding the children only. Amy testified that Joseph had "a history of calling * * * 70 plus times in a row, 20 times in a row, 30 times in a row, texting nonstop," and then if she didn't respond to his text "within 30 seconds," he sent another text asking why she was ignoring him. In Amy's view, this was "not parental communication."

{¶ 29} Amy further testified that, since April 2020, she had provided all of the transportation of the children for exchanges; Joseph refused to contribute because he had been trespassed from her apartment in July 2020. Amy described the trespass incident as follows: when Joseph was on FaceTime with the children, he told her "to go f*** [her]self," and she ended the phone call. Less than 40 minutes later, someone was banging on her door; she saw from her window that Joseph was covering the peep hole and banging on the door. Amy called 911. The children were with her at the time.

{¶ 30} According to Amy, Joseph speaks to her like she's "absolute trash," belittles her, and continually calls her names and makes derogatory statements. Many of their text exchanges were "done over voice text," so the kids could hear all of it. Amy presented to the court multiple text messages reflecting Joseph's inappropriate communication to her. For example, in Exhibit 34, he texted, "Hey slut I need you to come back and get your s*** that you left here," "you are a f****** selfish b****," and "I am never going to consider your f****** feelings again until you've changed toward me." Exhibit 57 contained a screenshot of Joseph, with his son in his lap, using a profane gesture toward Amy in a Facetime call. Joseph acknowledged that, while Amy was trying to reach her son to say goodnight on his iPad, Joseph sent the following message to her on the son's iPad on April 8, 2021: "F*** you for trying to circumvent. You cannot go around me. You refuse to let me talk to them and I'm not going to let you have your way, period. P*** off until you can be fair."

{¶ 31} Amy also testified that Joseph had refused to allow her to talk to the children if she was in the presence of her boyfriend, and Joseph required that she prove her

location before he would permit her to FaceTime or talk with the children. According to Amy, Joseph would not let her talk with the children unless she was at her house; Amy had never denied Joseph phone calls with the children, but she had ended phone calls after he "cussed [her] out."

{¶ 32} In response to this testimony, Joseph alleged that Amy had "cherry picked" examples of negative conversations and comments that he had made, but he acknowledged on cross-examination that he had not supplied the court with any examples demonstrating positive communication with Amy.

{¶ 33} Amy testified of her concern regarding the children's electronics usage while in Joseph's care. She testified that Joseph had bought the children iPads, laptops, and new iPhones; Amy presented screenshots of their son's iPad usage after he spent time at Joseph's home from February to April 2021, noting that the time periods of usage ranged from five hours on a school night to 16 hours on April 4th, which was Easter Sunday. Amy also testified that the children had been upset that they did not attend church or do an Easter Bunny visit at Joseph's home on Easter.

{¶ 34} Amy testified that she had observed Joseph drunk while the children were in his care. She stated that during March or April 2020, she entered Joseph's house to pick up the children and found Joseph passed out, and she was unable to wake him up. She stated that Joseph sometimes forgot when she was picking the kids up, and she had come into the house. Amy identified Exhibit 47 as a photo of Joseph, passed out, while the children were in his care. She testified that prior to the divorce, Joseph drank alcohol daily. Joseph testified, however, that he had had an alcohol assessment done and no

additional drug or alcohol counseling was suggested. He stated that he was charged with an OVI in August 2019, that he provided a urine sample to law enforcement which came back under the legal limit, and he was subsequently charged with reckless operation.

{¶ 35} Amy testified that Joseph owns guns and leaves them out in the open and unsecured at his home. She identified photos taken by her of a gun on the kitchen island in the marital residence with their son in the background, a gun beside multiple bottles of alcohol, and Joseph's "AR sitting out on the mantle."

{¶ 36} Regarding the children's medical issues, Amy testified that the parties' son had been diagnosed with asthma, spasmatic croup, juvenile idiopathic arthritis, and hypermobility of his joints. He used an inhaler daily and saw a pulmonologist, rheumatologist, ophthalmologist, and physical and occupational therapists. Amy stated that she schedules the child's medical appointments. According to Amy, Joseph continually tells their son that he "doesn't have arthritis," "doesn't really have these issues," and that his mother is "making it up" and "convincing the doctors" because she's "obsessed with medicine." Joseph acknowledged that he had asked his son's doctor to review the arthritis diagnosis and "routinely questioned" the doctors, but he asserted that he gave the children any prescribed medication.

{¶ 37} On cross-examination, Joseph testified that he had medical issues with his pituitary gland and his thyroid. He also stated that he had PTSD; it does not interfere with his daily life, but "tense situations do exacerbate high levels of anxiety" and initiate "fight or flight responses" typical of PTSD. He also had high blood pressure, high

cholesterol, and allergies. Joseph stated that he anticipated having to have surgery on three disks in his neck in the future.

{¶ 38} The court specifically found Amy to be credible and that Joseph "creates most of the problems in regard to communication." The court found that Joseph could be "overly demanding in his requests" and had engaged in "totally inappropriate behavior" while communicating with Amy. It also concluded that Amy had been the children's primary caretaker throughout their lives. The court expressed "significant concerns" about whether Joseph took the children's medical issues seriously.

{¶ 39} The court ordered that Amy be designated as the residential parent of the children. The court ordered that Joseph have "midweek parenting time" from Thursday after school until Friday morning, plus every other weekend, and that his weekend parenting time be from Thursday after school until Monday morning. The court determined that each party was entitled to one phone call and/or FaceTime interaction per day with the children while the children were with the other party. The court ordered the parties to use OurFamilyWizard as a means of communication.

{¶ 40} Based on the evidence presented, the trial court reasonably concluded that designating Amy as the residential parent and legal custodian of the parties' children was in the children's best interest. Amy had been the primary caregiver for the children prior to the separation. Most significantly, the parties were unable to communicate effectively, and the trial court reasonably concluded that Joseph created most of the problems regarding communication with his repeated inappropriate and demeaning behavior towards Amy. The trial court's concern about Joseph's conduct regarding the medical

issues faced by the parties' son was well-founded, and it reasonably credited the GAL's observation that a "primary voice" was needed regarding the child's care. Accordingly, Joseph's second and third assignments of error are overruled.

{¶ 41} We will consider Joseph's fourth, fifth, and seventh assignments of error together. They are as follows:

THE TRIAL COURT COMMITTED PLAIN ERROR BY AWARDING WIFE AN INAPPROPRIATELY HIGH SPOUSAL SUPPORT AND FOR A LONGER DURATION THAN IS REASONABLE.

THE TRIAL COURT COMMITTED PLAIN ERROR BY AWARDING AN INAPPROPRIATELY HIGH CHILD SUPPORT AMOUNT BASED ON THE TESTIMONY REGARDING THE INCOME OF THE PARTIES.

THE TRIAL COURT COMMITTED PLAIN ERROR BY ORDERING THAT PLAINTIFF BE RESPONSIBLE FOR 73% OF THE DEBT AND DEFENDANT BE RESPONSIBLE FOR 27% OF THE MARITAL DEBT.

{¶ 42} In each of these assigned errors, Joseph argues that the trial court erred in determining his income for purposes of calculating spousal support, child support, and the payment of the marital debt.

{¶ 43} Regarding spousal support, as this Court has previously noted:

A trial court enjoys a great deal of latitude in awarding spousal support, including the amount thereof, and its determinations are only reversible for an abuse of discretion. *Hittle v. Hittle*, 181 Ohio App.3d 703, 2009-Ohio-1286, 910 N.E.2d 1042, ¶ 9. * * *

While the court has broad discretion, it is not unlimited, and R.C. 3105.18(C)(1)(a)-(n) set forth 14 factors it must consider, including: (a) the income of the parties; (b) the relative earning abilities of the parties; (c) the ages and physical, mental, and emotional conditions of the parties; (d) the retirement benefits of the parties; (e) the duration of the marriage; (f) the extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home; (g) the standard of living of the parties established during the marriage; (h) the relative extent of education of the parties; (i) the relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties; (j) the contribution of each party to the education, training, or earning ability of the other party; (k) the time and expense necessary for the spouse who is seeking support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided it is actually sought; (l) the tax consequences; (m) the lost income production capacity of either party that resulted from that party's marital responsibilities; and (n) any other factor that the court finds to be relevant and equitable.

The trial court is not required to comment or make findings on each factor, but it must consider all of them. *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 28 (2d Dist.), citing *Kreilick v. Kreilick*, 161 Ohio App.3d 682, 2005-Ohio-3041, 831 N.E.2d 1046, ¶ 24 (6th

Dist.). Absent evidence to the contrary, it is presumed that the court considered each factor. *Casper v. Casper*, 12th Dist. Warren Nos. CA2012-12-128, CA20212-12-129, 2012-Ohio-4329, ¶ 42. *Henderson v. Henderson*, 2d Dist. Greene Nos. 2020-CA-40, 2021-CA-5, 2021-Ohio-3117, ¶ 12-14.

**{¶ 44}** Further:

"[A] trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion." *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108, 1997-Ohio-105. * * *

"In any action in which a court child support order is issued or modified * * *, the court or agency shall calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of sections 3119.02 to 3119.24 of the Revised Code." R.C. 3119.02. The Supreme Court of Ohio has required strict compliance with the statutory procedures for an initial award or modification of a child support order. *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 601 N.E.2d 496. "The trial court must include the worksheet in the record so that an appellate court can meaningfully review the trial court's order." *In re S.H.*, Montgomery App. No. 23382, 2009-Ohio-6592, ¶ 45, citing *Marker*, supra.

Generally, the amount of child support that would be payable under

a child support order, as calculated pursuant to the basic child support schedule and applicable worksheet through the line establishing the actual annual obligation, is rebuttably presumed to be the correct amount of child support due. R.C. 3119.03. * * *

*Johnson v. McConnell*, 2d Dist. Montgomery No. 24115, 2010-Ohio-5900, ¶ 13-15.

{¶ 45} The evidence offered with respect to the issues of income and support was as follows:

{¶ 46} Amy testified that she completed nursing school in December 2019; at the time of the hearing, she worked as a registered nurse at Miami Valley Hospital. She worked three 12-hour shifts per week, earning $29.00 per hour. Amy's W-2 for 2020 showed an income of $48,233.64. She stated that she expected to make $56,000 in 2022. Amy testified that Joseph made "quite a bit more" than she did and that his earning potential far exceeded hers.

{¶ 47} Joseph stated that he started Tactical Data Solutions, LLC (TDS) in November 2019, but the business hadn't worked out as he had hoped. He entered into a contract with American Data Solutions (ADS) on December 17, 2019, which included a signing bonus that was to be paid in six monthly installments of $50,000 each. Joseph stated that the first installment was paid in December 2019, but the contract was terminated thereafter, on December 26, 2019, and he did not receive the remaining five payments.

{¶ 48} Joseph testified that, before he started TDS, he had worked for Whitney, Bradley and Brown for three years. In his final year there, he had earned about

$130,000. He had also served in the military for 20 years and received retirement and disability pay.   He had retired from the military in 2013.

{¶ 49} Joseph stated that, at the time of the hearing, he did "ad hoc consulting" under a "handshake agreement," that he did not get paid if he did not get work, and that he had no contracts in place for his business at that time; he did not expect his "ad hoc" agreement with ADS to last past the end 2022.   Joseph's 2020 1099 from ADS reflected income of $218,333.30.

{¶ 50} Joseph testified that he paid the children's tuition of $1,300 per month, provided health insurance for the children and Amy at a cost of about $2,000 a year, and paid for the children's counseling sessions, which insurance did not cover, and their daughter's gymnastics each month.   He acknowledged that Amy had been a stay-at-home mom from the time she became pregnant with their son until she went to nursing school.

{¶ 51} Joseph testified that in response to discovery he had submitted records from a business checking account from BOA that he opened in late 2019; those documents were from November 21, 2019, until April 30, 2021.   He acknowledged that the records reflected that on December 24, 2019, he deposited $50,000, and he testified that it was an early payment for the first bonus payment due on January 3, 2020.   He stated that the records reflected no other deposits of $50,000 because he did not receive any.

{¶ 52} Joseph acknowledged that he had opened a second business account at Chase Bank and provided records of that account from November 25, 2020, until May 13,

2021. He also acknowledged that, beginning in December 2020, he was paid $21,833.33 each month, which was deposited in that account and was an identical amount to that provided in the contract with ADS. When asked if he was currently earning that amount monthly, Joseph replied, "[u]p until this month, yes." Joseph did not provide any records to show that he no longer was earning the contract amount. He agreed that $21,833.33 a month equates to $261,999.96 a year.

{¶ 53} Joseph testified that his BOA account for January 2020 did not reflect a deposit from ADS, but that his February 2020 record reflects a deposit of $21,833.33 from ADS. Joseph stated that his monthly statements from March through December 2020 did not reflect ADS deposits. When asked what happened to the money reflected in his 2020 1099 from ADS, Joseph replied that the "rest of the money was spent." He stated that he "cashed the checks" from ADS and did not deposit them in the bank because he "[d]idn't have a reason to." Joseph acknowledged that the total deposits into his BOA account for 2020 totaled $69,085.27 and that, other than the $21,833.33 payment, all the money came from somewhere other than ADS. Joseph denied putting the money into a Wright-Patt Credit Union account that he failed to disclose in discovery, which he referred to as "an oversight on my part," or into his personal account.

{¶ 54} Regarding his personal USAA records, Joseph stated that in the period of February 24 to March 23, 2020, he made a total deposit of $25.00. In the following period he made two "mobile deposits" of $2,800 and $8,000. He testified that the two mobile deposits were cashier's checks from the Wright-Patt Credit Union account. When asked where the money came from, Joseph stated that it was part of the compensation for his

consulting work. Joseph stated that he "had honestly forgotten" about the Wright-Patt Credit Union account because its "sole use" was for depositing cash to "get a cashier's check" so he "could make mobile deposits." Counsel represented that the total mobile deposits from February 24, 2020, through January 22, 2021, equaled $76,025. The following exchange occurred:

Q. And again, all of those deposits were made from sources other than [ADS], correct?

A. That's correct.

Q. So that $76,025 from your USAA personal account added to the deposits in 2020 into your [BOA] business would be $145,110. Do you agree with that?

A. * * * I haven't done the math.

Q. * * * So again, the total combined amount from both of those accounts in 2020, other than that February deposit which is clearly from ADS in your USAA account, does not include the remainder of the $218,333 stated on your 2099 [sic], right?

A. I'll take your word for it again.

Q. * * * And umm, other than the last two months of 2019 in your [BOA] records that you provided, you produced no accounts or bank records for 2019, have you?

A. None that are in my possession or that I have access to.

{¶ 55} Joseph acknowledged that his financial disclosure affidavit filed on

February 20, 2020, listed his total income from all sources as $65,000, because "at that time [his] goal for the business had all but tanked and [he] was going to be on a fixed income which would include the military retirement and VA disability." Joseph admitted that his monthly disability payment of $3,649.23, which he was receiving when he filed for divorce, was not reflected on his affidavit. Further, in Section V of the affidavit, which covered "Other Assets" including bank and retirement accounts, Joseph only listed his and Amy's joint USAA account and not his BOA account, his Wright-Patt Credit Union account, or his Fidelity 401(k) account.

{¶ 56} On redirect examination, Joseph stated that his "ad hoc" agreement with ADS was "absolutely not" a viable option for him going forward, because he had been made a "verbal offer" of employment by "a government organization" which he could not name, and in order to "remain on the right-side of ethics," he had to break with ADS and any company "that may support this other organization." Joseph did not have documentation of the pending employment offer or the alleged required separation.

{¶ 57} Regarding the parties' incomes and spousal support, the court found:

Three years ago, Joseph was employed at Whitney Brown and earned approximately $135,000.00 per year. In 2019, Joseph started his own business, Tactical Data Solutions. Joseph entered into a contract with American Data Solutions on December 26, 2019. Joseph's 2020 1099 from American Data Solutions indicate[s] that he received income from them in the amount of $218,333.00. However, Joseph has indicated that he does not believe his work will continue with American Data Solutions

past calendar year 2022. Joseph indicates that his contract was terminated with American Data Solutions on December 26, 2019.

However, from December 7, 2019 through May 21, 2020, Joseph received monthly deposits from American Data Solutions in the amount of $21,833.00. This was the exact monthly amount that was stated in the contract. If Joseph had received the entire amount, he would have $511,000.00 in 2020. Joseph testified that, because he now has a government job offer, he has to separate himself from private employment for a period of time. Additionally, Exhibit 85 shows that Joseph received $76,225.00 in deposits from American Data Solutions for consulting fees. Joseph provided bank statements from December 7, 2020 through May 13, 2021, but did not provide any bank statements after May 13, 2021.

Joseph also has a VA Disability of $3,600.00 monthly. Joseph indicates this will decrease if he becomes divorced. Joseph also receives military retirement of $1,600.00 per month, of which Amy will receive a small portion after the parties' divorce.

Amy works at Miami Valley Hospital and has an Associate's Degree as a Registered Nurse. Amy earns $29.00 per hour. She works three days a week, from 7:00 a.m. to 7:00 p.m., and the days vary from week to week. Amy testified that she will make approximately $56,000.00 annually in 2022.

Amy testified that she was a food worker when the parties met, but

became a stay at home mom.

The court finds that Amy's income for purposes of calculating spousal support is $56,000.00 annually. The court finds that Joseph earns $261,996.00 annually from his employment. The court arrived at this figure by taking the monthly amount he was due under the contract with American Data Solutions ($21,833.00 x 12 = $261,996.00). Joseph continued to receive those sums through at least May of 2020 and, in fact, received a 1099 from American Data Solutions for tax year 2020 in the amount of $218,333.00. The court is not including in Joseph's income the $250,000.00 he would have received as a signing bonus, in that, this was a one-time payment and not an ongoing income source. Additionally, Joseph receives $3,600.00 monthly, or $43,200.00 annually, in VA Disability Benefits. Joseph also receives a military retirement of $1,600.00 monthly, or $19,200.00 annually, however, Amy will receive a small portion of that after the parties' divorce.

The court finds that Joseph has an annual income of $321,996.00. This represents $261,996 annually in income from employment, $43,200.00 annually in income from VA Disability, and $16,800.00 annually in retirement income. The parties testified that Joseph would not receive all of his $19,200.00 retirement income and that Amy would receive a small portion. However, the court was not given an exact number. Therefore, the court will estimate that Joseph will receive $1,400.00 per month in

retirement income and Amy will receiv[e] $200.00 per month. As a result, the court finds that Joseph has retirement income from the military of $16,800.00 per year. The court finds for purposes of spousal support that Amy has $56,000.00 annually in income from employment and $2,400.00 annually in income from Joseph's Military retirement.

After having considered the statutory factors in O.R.C. § 3105.18(C), the testimony of the parties, their credibility and demeanor, the court finds that Joseph shall pay to Amy $3,500.00 per month as and for spousal support for a period of 51 months. Said spousal support shall be subject to the continuing jurisdiction of the court as to both amount and duration.

{¶ 58} The court ordered Joseph, in accordance with the child support guidelines and pursuant to the attached worksheet, to pay total child support in the amount of $2,235.17 per month, effective with the filing of the final judgment and decree of divorce.

{¶ 59} Having thoroughly reviewed the income of the parties, the trial court's calculations, and the child support worksheet, we see no abuse of discretion in the trial court's determinations regarding the income of each party or the spousal support or child support award. It appears that the court conservatively calculated Joseph's income at $321,996 (including his employment income, disability, and retirement income). After the date he claimed his contract with ADS was terminated, Joseph coincidentally continued to receive payments from the company in the contractual amount until, he asserted, the time of the final hearing. Joseph appeared to be moving money around in unusual ways and cashing large checks while not depositing all of his income, and he did

not provide records for all of his income or accounts. Joseph did not fully comply with discovery requests. He was vague in describing why his employment with ADS was ending at the time of the final hearing, and the court clearly did not credit that testimony.

{¶ 60} The record reflects that the court considered the statutory factors in R.C. 3105.18(C), and the spousal support obligation of $3,500 per month for 51 months was reasonable. Further, as reflected in the attached worksheet, child support in the amount of $2,235.17 was appropriate. Finally, based upon the parties' income as determined by the trial court, the court determined that it would equitably distributed the parties' debts in accordance with their relative incomes, with Joseph paying 73% of the marital debt and Amy paying 27%. In the absence of an abuse of discretion, Joseph's fourth, fifth, and seventh assignments of error are overruled.

{¶ 61} Joseph's sixth assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING WIFE THE TAX EXEMPTIONS FOR BOTH OF THE PARTIES' MINOR CHILDREN EACH AND EVERY YEAR.

{¶ 62} Joseph asserts that "there was no testimony at trial regarding any of the factors related to the award of the tax exemption" and that a "fair and equitable distribution of the exemption would dictate that each parent receives an exemption." The trial court ordered that Amy could claim the children as tax exemptions for all purposes under federal, state and local tax laws in all years.

{¶ 63} R.C. 3119.82 requires trial courts to designate which parent may claim children who are subjects of support orders as dependents for purposes of the federal

income tax.   It provides:

> Whenever a court issues * * * a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes * * *. If the parties agree on which parent should claim the children as dependents, the court shall designate that parent as the parent who may claim the children. If the parties do not agree, the court, in its order, may permit the parent who is not the residential parent and legal custodian to claim the children as dependents for federal income tax purposes only if the court determines that this furthers the best interest of the children * * *. In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children.

{¶ 64} As this Court has previously noted:

> The foregoing statute recognizes a presumption that the custodial parent will receive the tax exemption for dependent children.   It provides that a noncustodial parent may be awarded the exemption only upon a finding by the trial court that such an allocation furthers the best interest of

the children. Therefore, the default position, absent this finding by the trial court, is that the custodial parent receives the tax exemption. See, e.g., *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 56. The presumption that the custodial parent should receive the tax exemption comports with federal law. *Hughes v. Hughes* (1988), 35 Ohio St.3d 165, 167, 518 N.E.2d 1213.

*Bohme v. Bohme*, 2d Dist. Montgomery No. 26021, 2015-Ohio-339, ¶ 49. (Other citations omitted.) "Decisions on tax exemptions are within the discretion of the trial court and are reviewed for abuse of discretion." *Baker v. Baker*, 2d Dist. Montgomery No. 25429, 2013-Ohio-1816, ¶ 47.

{¶ 65} Amy testified that she wanted the tax exemptions awarded to her. Joseph provided no testimony related to receipt of the tax exemptions. Considering the presumption in favor of the custodial parent, Joseph's silence on the issue, the relative financial circumstances of the parties, and the court's designation of Amy as the residential parent of the children, we see no abuse of discretion in the trial court's award of the tax exemptions to Amy. Joseph's sixth assignment of error is overruled.

## II. Conclusion

{¶ 66} Having overruled Joseph's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.